## Commonwealth, Appellant, *v.* Tabb.

Argued November 14, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Joel S. Moldovsky,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Cecil B. Moore,* for appellee.

OPINION BY MR. JUSTICE EAGEN, January 15, 1969:
On November 22, 1962, Lincoln L. Tabb was convicted by a Philadelphia jury of murder in the second

degree. Motions in arrest of judgment and for a new trial were filed. After argument, the court below granted the motion in arrest of judgment. Such a result was thought necessary because the court determined that error was committed at Tabb's trial by the admission of incriminating statements which Tabb had made while in the custody of the police. The court felt that without the use of those statements, the verdict could not stand. The Commonwealth appealed from this order.

While this appeal was pending, the court below sua sponte vacated its order arresting the judgment and entered a second order granting a new trial. The Commonwealth then filed a timely appeal from the new trial order.

When these appeals were presented to this Court, we reversed the action of the court below in arresting the judgment, ruling that such an order could not be made on a diminished record. We also vacated the order granting a new trial, ruling that the lower court was without jurisdiction to proceed further with the cause or to modify its original order after an appeal from it had been filed and perfected in this Court. However, since evidence of Tabb's incriminating statements to the police had been admitted at his trial in the absence of the procedure mandated by *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964), we remanded the record to the trial court with directions to proceed with a post-trial hearing at which the admissibility of the evidence would be determined. See *Commonwealth v. Tabb*, 417 Pa. 13, 207 A. 2d 884 (1965).

Subsequently, the trial court conducted a "Jackson" hearing and then granted a new trial. The ruling was based upon the conclusion that Tabb's incriminating statements to the police were involuntary and

should not have been referred to at his trial. The Commonwealth, in this appeal, contests the lower court's ruling.

The pertinent facts supported by the record are these: On May 6, 1961, at about 2:30 a.m., the police observed an automobile, occupied by three young men, proceeding through Lansdowne, Delaware County, and they decided to stop the vehicle to make "a routine check." The police patrol car pulled abreast of the automobile at a red traffic light and the police directed the operator to pull off the highway. In apparent obedience to this directive, the automobile left the highway and stopped in front of a diner; but as the police stopped their car to the rear and were alighting to question the driver, the automobile sped off at an excessive rate of speed. The police gave chase and fired several shots at the tires. The automobile finally careened off the highway and came to rest after colliding with a telephone pole. The police found a "zip gun" in the automobile. They took the three occupants, one of whom was Tabb, into custody, and removed two of them to the Lansdowne Police Station.[1]

After a few minutes of questioning at the police station, Tabb readily admitted that the automobile had been stolen from a garage in the City of Philadelphia. After verifying the theft and notifying the Philadelphia police of the arrests, the police took the fourteen-year-old Tabb to headquarters at Yeadon, Delaware County, at about 4:30 a.m. Yeadon was regarded as the appropriate spot for Tabb's detention, since it is equipped with facilities for detaining juveniles.

At Yeadon Tabb slept. At trial, he testified that he slept for a period of five hours, but at the post-trial hearing, he said it was two hours.

---

[1] One [McDuffie] was taken to a hospital for treatment of minor injuries received in the collision.

At about 9:30 a.m., two police officers arrived at Yeadon from Philadelphia. One was Paul McLaughlin, who was connected with juvenile court. During questioning by McLaughlin extending over a period of about fifteen minutes, Tabb again admitted his participation in the theft of the automobile and his possession of the "zip gun." Before this questioning began, Tabb was advised that "he didn't have to tell me [McLaughlin] anything if he didn't want to."

Tabb was then taken by the officers to the headquarters of the Police Department in West Philadelphia. Following his arrival there at 11 a.m., Tabb was intermittently questioned until 5 p.m. by McLaughlin and another police officer. Before this questioning began, Tabb was again advised that he did not have to say anything; however, he was not advised of his other constitutionally guaranteed rights.

During the early part of this period of questioning, Tabb also admitted his participation in the burglary of a public school building and the armed hold-up of a grocery store. He also described how on the night before his arrest in Lansdowne, he, in company with another youth, had shot at a pedestrian in the street intending to rob him.

About 2 p.m. Officer McLaughlin left the police station and went to Tabb's home, where he obtained the gun used in the grocery store robbery. He talked with Tabb's mother who was already aware that her son was in police custody, having been so informed by a relative who heard the news over the radio. McLaughlin, accompanied by Tabb's mother, then returned to police headquarters, where they arrived between 4 and 5 p.m. Shortly thereafter, Tabb was allowed to see and talk with his mother for a brief period of time.

During the time when McLaughlin was away from headquarters, Tabb told the other officer who partici-

pated in the questioning that he was involved in the robbery-killing of a bread-truck driver which occurred on January 25, 1961.[2] This was the homicide of which Tabb was convicted in this case. When McLaughlin learned of this new development, he immediately asked Tabb if he was implicated. Tabb replied: "Yes, if they want me to say I did it, I will say I did it." McLaughlin then told him: "I don't want you to say nothing you didn't do. If you did, tell it. I want you to tell the truth." Tabb replied: "Well, if they want me to say I did it, I will say it." McLaughlin then said: "That's not the way to act. If you did it, you did; if you didn't, you didn't." After this McLaughlin notified the Homicide Division of the Police Department.

About 5 p.m. a sergeant of the Special Investigations Squad of the Police Department and two detectives arrived at the place where Tabb was detained and joined in the questioning. Again, admittedly, Tabb was not warned of his constitutional rights either before or during the questioning that followed.

About 5:15 p.m. Tabb told these officers that he had shot the bread-truck driver involved during an attempted hold-up committed by himself and another youth. Shortly thereafter, however, he said that this was not true and that he was only saying he committed the crimes because the police wanted him to. This situation continued until about 7 p.m.; Tabb would admit the crimes but immediately thereafter he would deny involvement in them. About 7 p.m. he made what the officers, in their trial testimony, termed a "final admission," i.e., Tabb unequivocally admitted having committed the crimes and detailed the circumstances of the occurrence. He was then allowed to

---

[2] At the time of this admission, this crime had not been solved.

see his mother again; he was given food to eat and he rested until 9 p.m.

Between 9 and 9:30 p.m., Tabb, at the request of the officers, wrote in his own hand a statement detailing the crimes. About 10:30 p.m. he re-enacted the crimes in the police station courtyard. About 11:45 p.m. he was questioned by representatives of the district attorney's office. At 1 a.m. on May 7th, he was taken to the Youth Study Center for the night.

On May 7th, about 11 a.m. Tabb re-enacted the crimes at the place of their occurrence. About 12:20 p.m., in answer to questions, he made a "formal confession" in the presence of investigating officers, which confession was recorded and typewritten. Later he read and signed this statement. Shortly thereafter, while seated alone near a typewriter and without urging from anyone, Tabb typed out in boyish, one-fingered fashion a short statement indicating that he was guilty of the crimes involved.

Over objection, evidence of Tabb's oral and written statements were admitted against him at trial. At the time this evidence was obtained, Tabb was fourteen years of age, had completed the seventh grade in school and possessed an I.Q. of 100. He had previous experience with the police, having been arrested several times before and having been once committed to a correctional institution.

The ruling of the court below that evidence of Tabb's incriminating statements was inadmissible at trial was based on the court's conclusion that the statements were secured under circumstances which overcame Tabb's will to resist self-incrimination, and hence were not the product of a free and discerning will.

The correctness of this conclusion is subject to our review. However, in a "Jackson" hearing, the trial court is the trier of the facts. *Commonwealth ex rel.*

*Butler v. Rundle,* 429 Pa. 141, 239 A. 2d 426 (1968). And in the instant case, the trial court found as a matter of fact that the challenged evidence was the product of a lengthy police interrogation in a coercive atmosphere; the court further found that during this period of interrogation, Tabb suffered from a lack of sleep and food[3] and was denied the assistance or counsel of a friendly adult. Despite the fact that the Commonwealth challenges these findings, they do, nonetheless, find support in the record and in view of that, we will not say that the trial court erred as a matter of law in concluding that self-incriminating statements which Tabb made and which were admitted against him were involuntary.

Order affirmed.

Mr. Chief Justice BELL dissents.

Mr. Justice MUSMANNO did not participate in the decision of this case.

---

[3] There is evidence in the record that with the exception of a cup of coffee which Tabb received during the early morning while he was still at Yeadon, Tabb was not given any food to eat until after 7 p.m.