Commonwealth, Appellant, *v.* Harmon.

Argued November 17, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*James D. Crawford,* Assistant District Attorney, with him *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Richard I. Torpey,* with him *Jeffry A. Mintz,* for appellee.

OPINION BY MR. JUSTICE EAGEN, October 9, 1970:

This is an appeal by the Commonwealth from an order entered below sustaining a motion to suppress a recorded incriminating statement obtained from the defendant, Barry Harmon, during police custody.

After the motion to suppress was filed, an evidentiary hearing was conducted.

The Commonwealth's witnesses testified as follows as to Harmon's arrest and the circumstances under which the suppressed statement was obtained:

On the night of August 22, 1968, Walton Posey was fatally shot in a bar in Philadelphia. About 6:30 a.m. on August 23rd, police officers went to the residence of the defendant, Harmon, awakened the family, took Harmon into custody and transferred him to the Homicide Division in the Police Administration Building. From about 7:30 to 8:15 a.m. Harmon, eighteen years of age, was questioned by Detective Sergeant Funk of the Police Homicide Division concerning the Posey killing, but said nothing of an incriminating nature.

Before this questioning began, the Detective Sergeant read to Harmon from a printed card a warning of the constitutional rights required by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), including his right to have counsel present during the questioning and his right to have such assistance supplied if he couldn't afford it. Harmon indicated that he understood these rights and didn't request the assistance of an attorney.

Beginning about 8:30 a.m. Harmon was questioned by Detectives McGill and Brown. At about 9 a.m. Harmon was given, with his consent, a polygraph test by Detective Cullen. At the conclusion of this test, the questioning by Detectives McGill and Brown resumed. About 12:30 p.m. Harmon was given a "coke", his first sustenance of the day, and then the questioning was taken up by a Detective Patterson with McGill and Brown watching the interrogation from an adjoining room through a one-way glass-covered aperture. Shortly thereafter, in answer to Patterson's questions, Harmon admitted that on the night of August 22, 1968, while armed with a shotgun, he entered the bar where Posey was killed and fired a shot. Following this, a second polygraph test was taken. About 3:15 p.m. Harmon was again given a warning of his "Miranda" rights, and the statement which the court below suppressed was taken. The statement, in question and answer form, was recorded on a typewriter and when completed was read and signed by Harmon at about 4:35 p.m.

However, testimony offered on behalf of Harmon at the hearing established the following, which the lower court found to be true and incorporated into its findings of fact:

When Harmon was taken into police custody at his home during the early morning of August 23rd, both he and his mother requested of the arresting officers

that she be permitted to accompany him to police headquarters, but these requests were refused. Harmon's mother then arranged for private transportation and arrived at the Homicide Division in the Police Administration Building about the same time as her son. She immediately asked to see him, but the request was refused. Similar requests were repeated many, many times during the day, but the most favorable response she received was that she could see her son soon. This "soon" finally turned out to be 6 p.m.

While being questioned by the police, Harmon himself made repeated inquiries as to whether his mother or anyone else was there to see him, but the detectives "acted like they didn't hear me . . . ."

About 11:30 a.m. on August 23, 1968, Robert Manley, a field representative for the Commission on Human Relations who had worked with Harmon during the preceding months, upon being informed of Harmon's arrest, visited the Homicide Division at police headquarters and requested permission to see him. He was told by Detective Sergeant Funk that he could see Harmon when the police "were finished with him." Manley then left police headquarters and attempted to obtain legal assistance for Harmon. About 3 p.m. he arrived back at police headquarters and his second request to see Harmon was refused.

About 4:15 p.m. on August 23, 1968, Jeffry A. Mintz, Esq., of the Public Defender's Office arrived at police headquarters, and after talking with Harmon's mother, he knocked at the door of the room where Harmon was being questioned and told a responding police officer that he represented Harmon, that he wanted to see his client and that he didn't want him to make any statement. He was told to have a seat and to wait until he was called. Mintz, Manley and Harmon's mother were finally granted permission to see Harmon at

6 p.m. At this time, Harmon appeared "washed out or drained" and was "shaking, crying and burying his head in his hands . . . ."

The Commonwealth's position is that, in view of Harmon's failure to request the assistance of legal counsel after having been fully informed of this right, there was no constitutional obligation on the part of the police to permit third persons (other than a lawyer Harmon personally requested) to "intrude" upon the interrogation. And decisions in other jurisdictions lend some support to this position. See *People v. Eli*, 66 Cal. 2d 63, 56 Cal. Rptr. 916, 424 P. 2d 356 (1967); *People v. Pierre*, 114 Ill. App. 2d 283, 252 N.E. 2d 706 (1969); and *People v. Townsend*, 4 Cr. L. 2068 (Kings County Supreme Court October 8, 1968). However, without reaching the issue of whether or not the challenged statement was secured under impermissible constitutional circumstances, we refuse to overrule the lower court's ruling suppressing the statement.

While the trial court's conclusions at a "Jackson" hearing are subject to review on appeal, its findings of fact if supported by the evidence are not. *Commonwealth v. Tabb*, 433 Pa. 204, 249 A. 2d 546 (1969). The facts found by the lower court, which are amply supported by the record, disclose the use of tactics in the securing of the challenged statement which we cannot condone. If for no more than fairness and policy, the suppression order should be affirmed.

It is so ordered.