Geiger Appeal.

112

Argued September 15, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Martha K. Treese*, Assistant Defender, with her *Vincent J. Ziccardi*, Defender, for appellant.

*Milton M. Stein*, Assistant District Attorney, with him *James T. Ranney*, Assistant District Attorney, *James D. Crawford*, Deputy District Attorney, *Richard A. Sprague*, First Assistant District Attorney, and *Arlen Specter*, District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, March 30, 1972:
Order affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:
This is an appeal from an adjudication of delinquency based on a rape charge.

Alphonso Geiger, a 15-year-old, was arrested on May 28, 1970, at 6:30 p.m., on Market Street in Philadelphia. The arresting officer testified that Geiger was arrested because he resembled a description of a rapist furnished by a rape victim.

Geiger was taken to the police station, at which time he was warned of his rights as required by *Miranda v. Arizona,* 386 U.S. 436 (1966), and interviewed by a Detective Chidester. During this interrogation, according to Chidester, appellant "told me that he did attack a woman in the subway and that he did rape the woman in the subway. The interrogation was halted at this point. I was busy notifying the complainants and other witnesses to come in and I was making arrangements for a lineup. He [appellant] was given lunch at 10:45. He was placed in the standup at 11:00 p.m. [at which he was not identified]. At 12:01 a.m. he was taken to the Police Administration Building. At 4:20 a.m. he was given a polygraph examination, and he was interviewed at this time and gave us an oral statement to myself and Lieutenant Robert Clark."

According to Chidester, the first oral statement was made at 8:50 p.m. and the second oral admission was made at the Police Administration Building at 5:05 a.m. Following appellant's admission at 5:05 a.m., he was transported back to Central Detective Headquarters where he was placed in another lineup. He was not identified. After the lineup appellant was interviewed again beginning at about 7:35 a.m. At 8:00 a.m. he was given breakfast. Thereafter, appellant was ordered to change his clothes, and subsequently at 12:15 p.m., he was again taken down to the Police Administration Building for a second polygraph examination. From the time of appellant's early morning arrival at Central Detective Headquarters, located at 20th and Pennsylvania Avenue, until he was taken back shortly after noon to the Police Administration Building, located at 8th and Race Streets, he was allowed brief periods of rest while being kept in a locked, 8' x 12' interrogation room. During those rest periods appellant was ob-

served napping on top of the table in the lighted room. No other sleeping facilities were offered.

From 12:15 p.m. until 3:00 p.m. appellant was subjected to the second polygraph examination. At about 4:00 p.m. appellant commenced the giving of a written statement which was completed at 5:47 p.m.

During the appellant's entire confinement of almost twenty-four hours no relatives or friends of appellant were allowed to visit with appellant, who was without representation by counsel. The uncontradicted evidence was that appellant's uncle received a telephone call at 1:30 a.m. on the morning of May 29, 1970, from appellant's sister, informing him that his nephew had been arrested and was being held at the Central Detective Division.

Appellant's uncle then immediately telephoned Central Detective Division and spoke to Officer Clark, who was one of the officers participating in the interrogation. Appellant's uncle asked Clark what his nephew was being held for. Clark "said some charge, and I said that I would like to see him and he said no, I couldn't see him."

"BY THE COURT:

"Q. This was on the telephone?

"A. Yes. Mr. Clark, he told me no, I couldn't see him, the only people that could see him was his grandmother, his mother or an attorney. My attorney was out of town at that time and I had to get a different attorney, and at the present I have Mr. David Salaman.

"I called his grandmother and told her that they wouldn't let me see him. She was sick in bed at that time and she said, 'Call them back and tell them that I gave you authority to see Alfonso, because I am sick in bed'.

"I called back and I talked to Mr. Clark and he said, 'Do you own a laundromat?' I said, 'Yes'. He said, 'Does Alfonso work for you?' I said, 'Yes'. This was Mr. Clark. I was speaking to him about 1:30 in the morning.

"I couldn't go to see him."

Appellant's grandmother also testified that she had called Central Detective Headquarters at 9:00 a.m. on the morning of May 29, 1970, but was told that she was unable to see her grandson, even though she stated that she wanted to come down to see her son.

In conflict with this testimony was the testimony of Officer Bell that on 9:30 a.m. on May 29, he called appellant's grandmother's telephone and someone answered who stated that she was appellant's grandmother. According to Officer Bell, he told this person that appellant was being held and that she could come to Central Detective Headquarters to talk with him. This person responded that since appellant was being "held only and there was no point in her coming there." Officer Bell stated that he did not inform the purported grandmother that her grandson was being subjected to interrogation or that her grandson was entitled to an attorney.

Following the suppression hearing, an adjudication hearing was held before the same judge who had heard the suppression motion. At the hearing the only confession introduced was appellant's written confession. No other evidence against appellant was introduced other than the testimony by two rape victims that they had been raped. Neither could give any positive identification of their respective attackers. The Commonwealth then rested, and the defense introduced alibi testimony. At the conclusion of the trial, appellant was adjudicated delinquent.

Considering all the evidence, including the confession, I would require a new hearing, as I believe that the written confession in this case was obtained in gross violation of appellant's constitutional rights and the law of this Commonwealth. It is appalling that any 15-year-old would be held in police custody and be subjected to relentless police questioning concerning a major crime for just short of twenty-four hours, during which time the appellant was only allowed brief moments of sleep on top of a table in a lighted and locked 8′ x 12′ interrogation room.

The appellant was not informed that his family, represented by his uncle, had requested to see him, and appellant's family were not informed that they had a right to have an attorney speak with the child. Moreover, appellant's family were not informed that the police were in the process of interrogating appellant when they inquired of him. Instead, they were simply told that the child was being held. In this perspective the only reasonable way to view the interrogation is as a police attempt to break the spirit, stamina and will of the appellant.

Such an interrogation is repugnant for several reasons. Had the appellant been an adult, and by definition more mature and understanding, he would have been entitled to the express protection of Rule 118 of the Pennsylvania Rules of Criminal Procedure. That rule is almost identical to Rule 5(a) of the Federal Rules of Criminal Procedure, which was interpreted by the United States Supreme Court in *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957). Rule 118 states that "[w]hen a defendant has been arrested without a warrant, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him. If the complaint charges a

court case, the defendant shall be given an immediate preliminary arraignment."[1]

Our Rule 118 and its predecessor Rule 116 were adopted after the adoption of Rule 5(a) of the Federal Rules of Criminal Procedure, and the filing of the *Mallory* and *McNabb* cases interpreting the Federal Rule. While there has been no express case in Pennsylvania stating that the meaning and scope of our Rule 118 was intended to parallel that of the Federal Rule 5(a), several reasons dictate that such interpretation should be given. First, since the operative language of our Rule 118 is identical to that of Federal Rule 5(a), it would seem that when Rule 118 and its predecessor rule were adopted, recognition was given to the fact that the United States Supreme Court in *McNabb* and *Mallory* had already interpreted the scope and meaning of the same language in Rule 5(a). Therefore, had it been the intention of our state Supreme Court to depart from the principles set forth in *McNabb* and *Mallory,* it would have been a relatively simple matter to use language other than that which was used or to insert a disclaimer either in the rule itself or in the official comment thereto. This was, however, not done.

Second, my own review and reading of the working papers of the then Supreme and Superior Courts of Pennsylvania Criminal Rules Committee (now the Pennsylvania Criminal Rules Committee), which

---

[1] Rule 5(a) of the Federal Rules of Criminal Procedure provides that "an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith.

throughout its history has been very competently chaired by the Honorable Joseph SLOANE, has also convinced me that such was the intent of the drafters of Rule 116 and its successor, 118. Absent an express disclaimer from our Supreme Court to the contrary, which disclaimer has not been forthcoming, I would hold that our Supreme Court's intendment in adopting Rule 118 was to interpret the language therein in the same manner that the United States Supreme Court interpreted Federal Rule 5(a) in *McNabb* and *Mallory*.[2]

In *Mallory,* the United States Supreme Court held that scope of Federal Rule 5(a) and its purpose were as follows: " '[t]he purpose of this impressively pervasive requirement of criminal procedure is plain. . . . The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the "third degree" which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime.'

---

[2] See *Commonwealth v. Moore,* 444 Pa. 24, 279 A. 2d 146 (1971), wherein the Court did not reach the question of whether *McNabb* and *Mallory* apply to Rule 117 dealing with arrest by a warrant executed outside the county of issuance.

" Since such unwarranted detention led to tempting utilization of intensive interrogation, easily gliding into the evils of 'the third degree', the Court held that police detention of defendants beyond the time when a committing magistrate was readily accessible constituted 'wilful disobedience of law'. In order adequately to enforce the congressional requirement of prompt arraignment, it was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention." 354 U.S. at 452-453.

Thus, the United States Supreme Court concluded that: "[c]ircumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.

"[10] The circumstances of this case preclude a holding that arraignment was 'without unnecessary delay'. Petitioner was arrested in the early afternoon and was detained at headquarters within the vicinity of numerous committing magistrates. Even though the police had ample evidence from other sources than the petitioner for regarding the petitioner as the chief suspect, they first questioned him for approximately a half hour. When this inquiry of a nineteen-year old lad of limited intelligence produced no confession, the police asked him to submit to a 'lie-detector' test. He was not told of his rights to counsel or to a preliminary examination before a magistrate, nor was he warned that he might keep silent and 'that any statement made by him may be used against him'. After four hours of further detention at headquarters, during which arraignment could easily have been made in the same building in which the police headquarters were housed, petitioner

was examined by the lie-detector operator for another hour and a half before his story began to waver. Not until he had confessed, when any judicial caution had lost its purpose, did the police arraign him.

"We cannot sanction this extended delay, resulting in confession, without subordinating the general rule of prompt arraignment to the discretion of arresting officers in finding exceptional circumstances for its disregard. In every case where the police resort to interrogation of an arrested person and secure a confession, they may well claim, and quite sincerely, that they were merely trying to check on the information given by him. Against such a claim and the evil potentialities of the practice for which it is urged stands Rule 5(a) as a barrier." 354 U.S. at 455-456.

While it is true that the Pennsylvania Rules of Criminal Procedure do not literally apply to Juvenile Court proceedings, except. where the Rules explicitly provide [Rule 1(a) of the Pennsylvania Rules of Criminal Procedure], the reason for this is that the administration of the Juvenile Court was thought to work to the best interest of the juvenile without the formal trappings of pleadings and procedure as provided by the Criminal Rules. See *Holmes Appeal,* 379 Pa. 599, 109 A. 2d 523 (1954) ; *Wilson Appeal,* 438 Pa. 425, 264 A. 2d 614 (1970); and *In Re Gault,* 387 U.S. 1 (1967). This lack of formalization cannot, however, be thought to be in derogation of a juvenile's substantive rights.

Where a juvenile is faced with prosecutorial activity concerning the gathering of evidence, there is no state interest in denying him as strong a right as that of an adult to the protections against over-reaching police practice which violates fundamental state policy. Had appellant in this instance been an adult, the twenty-four hour interrogation process after arrest and before pre-

liminary arraignment would have been proscribed. The proscribed interrogation in *Mallory* only lasted six hours. I would hold, therefore, that the confession extracted in the instant case should have been suppressed.

Further, in the recent case of *Commonwealth v. Harmon,* 440 Pa. 195, 269 A. 2d 744 (1970), our Supreme Court dealt with a fact situation materially similar to that in the instant case. In *Harmon,* the 18-year-old defendant was arrested at 6:30 a.m., warned of his *Miranda* rights, and he was questioned from 8:30 a.m. until he completed and signed a typed statement at 4:35 p.m. that same afternoon. When Harmon was first taken into custody, however the police refused his and his mother's request that she accompany him. Throughout the time that Harmon was in custody his mother requested to see him, but she was refused access by the police. The detectives conducting the interrogation further refused to respond to Harmon's questions concerning whether his mother was there to see him. Finally, the police even refused the Public Defender access to Harmon until after Harmon had signed the confession. Based on these facts, the court rejected "the Commonwealth's position . . . that, in view of Harmon's failure to request the assistance of legal counsel after having been fully informed of this right, there was no . . . obligation on the part of the police to permit third persons (other than a lawyer Harmon personally requested) to 'intrude' upon the interrogation." 440 Pa. at 199.

Instead, the Court held that the facts in the case "disclose the use of tactics in the securing of the challenged statement which we cannot condone. If for no more than fairness and policy, the suppression order should be affirmed." 440 Pa. at 199.

*Harmon* condemns the police practice of isolating accused persons from counsel and family which seek to reach such persons during the course of police interrogation. It is such persons who offer comfort to an accused, present a friendly face to him and perhaps enable him to place in perspective a hostile interrogation. There seems little reason to dispense with this kind of aid. Indeed, to do so violates "fairness and policy" and certainly the spirit of *Escobedo v. Illinois,* 378 U.S. 478 (1964), wherein it was stated that "[n]o system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights [not to incriminate himself]. 378 U.S. at 490.

While it is true in the instant case that no lawyer was present to consult with the appellant, the proffered comfort and advice of his family may have been even more important to the 15-year-old appellant in the hostile environment of police custody and interrogation.

I would vacate the order of the lower court and order a new adjudication hearing to be held consistent with this opinion.

SPAULDING, J., joins in this dissenting opinion.