371 A.2d 468

**COMMONWEALTH of Pennsylvania**

**v.**

**John SULLIVAN, Appellant (two cases).**

**COMMONWEALTH of Pennsylvania,
Appellant,**

**v.**

**John SULLIVAN.**

Supreme Court of Pennsylvania.

Argued Jan. 16, 1975.

Decided Feb. 28, 1977.

130

132

134

136

138

Marilyn J. Gelb, Philadelphia, for appellant at Nos. 121 and 122 and appellee at No. 127.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James A. Shellenberger, Philadelphia, for appellant at No. 127 and appellees at Nos. 121 and 122.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

NIX, Justice.

On the evening of June 17, 1966, John Gorey, an officer of Teamsters Union Local 107, and his friend, Rita Janda, were fatally shot at the local union's Philadelphia office building. In November of that year, on the basis of evidence presented at a Medical Examiner's inquest, John Sullivan, also an officer of the local, was charged with both murders.[1]

Sullivan's jury trial began on June 7, 1967. On June 19, 1967, the jury found him guilty of two counts of murder in the first degree. The following day, the jury determined that Sullivan should be sentenced to serve two consecutive terms of life imprisonment.[2] Post-verdict motions were denied and judgments of sentence were entered.[3]

Sullivan appealed to this Court and, because the Court was equally divided, the judgments of sentence were upheld. *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1970). This Court denied a petition for reargument and later denied a self-styled "Petition for Leave to File a Petition for Re-consideration of the Petition for Reargument."

In 1974, Sullivan filed a petition for relief pursuant to the Post Conviction Hearing Act[4] in the Court of Com-

1. Two others, Gregory Carchidi and Anthony DiPasquale, were also charged with the murders.

2. The Act of June 24, 1939, P.L. 872, § 701, as amended, repealed by the Act of December 6, 1972, P.L. 1482, No. 334, § 5, provided that after a jury found a defendant guilty of murder in the first degree, it must determine whether life imprisonment or the death penalty should be imposed.

3. The motions for a new trial and in arrest of judgment were heard by a three judge court en banc. One of the judges dissented from the order denying the motions.

4. Act of January 25, 1966, P.L. (1965) 1580, 19 P.S. §§ 1180–1 et seq. (Supp.1975).

mon Pleas of Philadelphia. In this petition he asserted that (1) his trial counsel had been ineffective; (2) his appellate counsel had been ineffective; (3) numerous prejudicial errors had been committed during his trial; (4) the evidence the Commonwealth adduced at trial was insufficient to support a conviction of murder in the first degree; and (5) after discovered evidence entitled him to a new trial. Sullivan requested that he be discharged, granted a new trial, or granted appropriate relief.

After a hearing, the court concluded that Sullivan had not received effective assistance of counsel on appeal. It therefore issued an order granting Sullivan leave to file a new appeal to this Court. The court denied Sullivan relief on his other claims finding that some were without merit and that others were available to him in his new direct appeal to this Court.[5]

Three appeals resulted from the PCHA court's order. Appeal number 127 is the Commonwealth's appeal from the order granting appellant a new appeal; appeal number 121 is Sullivan's direct appeal; appeal number 122 is Sullivan's appeal from the PCHA court's denial of

5. We have since stated that the preferred practice is for a Post Conviction Hearing Court, having determined that petitioner is entitled to a direct appeal, to refrain from rulings upon the merits of the remaining claims for relief because they will be reviewable on the direct appeal process. *Commonwealth v. Webster,* 466 Pa. 314, 318–319, 353 A.2d 372, 374 (1975) (and cases cited therein). The only justification for a deviation from this practice is where the trial record is inadequate to provide a basis for a review of the claim or where the claim was not ruled upon by the trial court.

If the record is inadequate then it is the responsibility of the Post Conviction Hearing Court to permit the introduction of testimony and make the necessary findings that will allow for appellate review. Where the trial record contains sufficient basis for a determination but the trial court has failed to rule, then the Post Conviction Hearing Court must either make a determination whether the issue has been waived, or if not, reach the merits of the question presented. In that event, the determination of waiver or the decision on the merits would be subject to review on the direct appeal.

relief on other grounds. We will consider first the Commonwealth's appeal.

## I.

The Commonwealth argues that the PCHA court erred in granting Sullivan a new appeal because (1) the court was without authority to do so, and (2) the record fails to support the court's conclusion that Sullivan did not receive effective assistance of appellate counsel.

■ Initially, the Commonwealth argues that under the PCHA, "a trial-level court" cannot find that a petitioner's appellate counsel was ineffective and grant him leave to file a new appeal. Although the Commonwealth concedes that a claim of ineffective assistance of appellate counsel is cognizable under the PCHA, it maintains that "a rational system of judicial decision making demand[s] that [the court in which the direct appeal was initially filed] determine the effectiveness of representation by appellate counsel." Apparently, the Commonwealth would have a PCHA petitioner file his petition directly with the appellate court.

We cannot agree that such a procedure is desirable. Certainly the PCHA and our rules governing post-conviction proceedings, Pa.R.Crim.P. 1501–06, mandate that the hearing court initially decide a petitioner's claim.

Section 5 of the PCHA grants jurisdiction initially to the court that imposed the judgment of sentence:

> "(a) Any person who desires to obtain relief under this act may initiate a post conviction proceeding by filing a petition . . . with the clerk of the court in which he was convicted and sentenced which said court is hereby granted jurisdiction to hear and determine same."

Post Conviction Hearing Act § 5(a), 19 P.S. § 1180–5(a) (Supp.1975). See Pa.R.Crim.P. 1502.

Section 10 of the PCHA grants to the hearing court the power to initially fashion the appropriate relief. Post Conviction Hearing Act, § 10, 19 P.S. § 1180–10 (Supp.1975). Only when one of the parties is aggrieved by the order of the hearing court may the case be taken to an appellate court and then only by the traditional avenues of appeal. Post Conviction Hearing Act, § 11, 19 P.S. § 1180–11 (Supp.1975).

The Act thus makes no provision for the hearing of claims for PCHA relief in any court other than the court in which the judgment was originally entered. We decline the Commonwealth's invitation to ignore the statute and existing practice and adopt a drastically new procedure.

█ We believe that the statutory allocation of judicial responsibility in the determination of claims raised under the PCHA necessarily reflects the institutional capabilities of trial and appellate courts. When deciding a claim of ineffective appellate counsel, the hearing court must determine if the course chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth v. Frazier*, 455 Pa. 162, 314 A.2d 16 (1974) ; *Commonwealth v. Murray*, 452 Pa. 282, 305 A.2d 33 (1973) ; *Cf. Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Because this decision requires an examination of counsel's stewardship of the appeal in light of the available alternatives, it often will be necessary to call counsel whose assistance is challenged as ineffective so he may explain the decisions he made in the course of the appeal. Furthermore, both the petitioner and the Commonwealth may wish to call additional witnesses and present other evidence relevant to the petitioner's claim. *Cf. Commonwealth v. Twiggs*, 460 Pa. 105, 331 A.2d 440 (1974); [6]

6. In *Commonwealth v. Twiggs*, 460 Pa. 105, 331 A.2d 440 (1974), the appellant alleged on direct appeal that trial counsel was ineffective because he failed to secure the attendance of a witness

*Commonwealth v. Dancer*, 460 Pa. 95, 331 A.2d 435 (1974); *Commonwealth v. Murray*, 445 Pa. 546, 284 A. 2d 778 (1971). For this reason, the statute wisely requires petitioner to present all claims for relief to a trial court which has the facilities to hear and make findings of fact. The structure and function of an appellate court precludes it from being an initial factfinder.[7] *See e. g., Reed v. Universal C.I.T. Corp.*, 434 Pa. 212, 217, 253 A. 2d 101, 104 (1969).

We do not view a PCHA court's finding of ineffective appellate counsel after an evidentiary hearing as a challenge to the integrity of appellate decisions. Such a determination merely finds that counsel's ineffective stewardship of the appeal failed to adequately present to the appellate court some claim or claims upon which petitioner may have been entitled to relief. In determining whether appellate counsel was effective, the PCHA court passes not on our decision, but only on the conduct of the counsel who presented the appeal.[8] This the PCHA

who had testified in favor of the defendant at a previous trial. We could not conclude on the basis of the record of trial whether "counsel's decision not to secure [the witness's] appearance or to have the notes of Gilmore's previous testimony read to the jury was based on a reassessment of its worth and a conclusion that it was of little or no value in the posture of the case" or "the result of sloth or lack of awareness of the available alternatives". We therefore remanded the case to the trial court for a further exploration into counsel's reasons for his decision.

7. The Commonwealth argues that this limitation on the appellate court's judicial capabilities does not foreclose the procedure it proposes. It suggests that the appellate court can submit the case to a trial court for a factfinding hearing. We fail to see how this procedure will differ from that required by the statute. Its only effect would be to require an additional hearing before this Court before the evidentiary hearing necessary to resolve appellant's claim is held. This would cause unnecessary delays and create additional burden on the judicial process without any benefits to the administration of criminal justice.

8. The Commonwealth suggests that by allowing trial courts to grant new appeals upon finding ineffective assistance of appellate counsel, "every criminal defendant . . . can directly appeal his judgment of sentence . . . have the appellate courts resolve the issues on their merits, and yet . . .

court does on a new record established in an evidentiary hearing—a record not before the appellate court on direct appeal.

Moreover, the appellate court is not bound by the decision of the PCHA court. If the Commonwealth believes that the evidence is insufficient to support the court's findings of fact or its legal conclusion that counsel was ineffective, the Commonwealth may appeal to the appropriate appellate court as was done in the present case. Post Conviction Hearing Act, § 11, 19 P.S. § 1180–11 (Supp.1975).

In the instant case, Sullivan bases his claim of ineffective assistance of appellate counsel on two grounds: (1) the failure of counsel to file a brief in this Court and, (2) counsel's decision not to argue the case orally. The Commonwealth asserts that a brief, in fact, had been filed and that the decision to submit the case on briefs was reasonably made in Sullivan's best interests.

On the basis of the testimony adduced at the Post Conviction Hearing, the PCHA court reached the following conclusion:

"A careful consideration of all the testimony concerning defendant's appellate rights clearly indicates that oral argument was not waived by defendant and that there was considerable confusion between counsel concerning the appeal due to Judge DiBona's appointment to the bench and Mr. Peruto's heavy trial schedule.[9] In a matter involving a conviction for first degree murder, it is our opinion that defendant's right should have been fully protected and every possible ar-

retain the opportunity of obtaining a whole new direct appeal via the Post Conviction Hearing Act." This is, of course, a gross exaggeration. In order to obtain a new appeal, the defendant must be able to establish to the satisfaction of the PCHA court that his counsel was in fact ineffective. Thus our decision does not allow every criminal defendant the option of receiving a second appeal."

9. Judge DiBona, prior to his elevation to the bench, and Mr. Peruto, served as counsel for appellant.

gument fully explored. We cannot say that this was done in this case.

. . . . . . . .

"We are mindful of the fact that the Supreme Court divided evenly in its decision in this case. Oral argument might have persuaded a different decision. Furthermore, defendant was entitled to a carefully prepared brief by his counsel so that his argument could be fully presented and it does not appear that was done in this case. To this extent we find as a fact that there was ineffective assistance of counsel and that this requires granting defendant relief."

The findings of the PCHA court, which hears the evidence and passes on the credibility of the witnesses, should be given great deference. *See Commonwealth v. Smith,* 454 Pa. 256, 312 A.2d 396 (1973); *Commonwealth v. Minnick,* 432 Pa. 462, 247 A.2d 569 (1968). Consequently, this Court will not disturb its findings if they are supported in the PCHA record. *See Commonwealth v. Hauser,* 450 Pa. 388, 299 A.2d 218 (1973); *Commonwealth v. Tabb,* 433 Pa. 204, 249 A.2d 546 (1968); *Commonwealth v. Minnick, supra.* This is true even when the record could support a contrary holding. *See Commonwealth v. Hauser, supra.*

On this appeal, we find there is sufficient evidence in the record to support the factual findings of the PCHA court. Furthermore, counsel's filing of a highly unorthodox "brief" which failed to comply with our rules and which appears to be only a preliminary draft and his failure to argue the appeal orally support the PCHA court's legal conclusion that Sullivan was deprived of effective assistance of appellate counsel in his initial appeal.

Although the decision to proceed on appeal without oral argument may be a tactical one that counsel is entitled to make, see Supreme Court Rule 32, like every

tactical decision, that option must be selected on some reasonable basis designed to effectuate the client's interests. *See Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). According to the findings of the PCHA court, the appeal was submitted on the "brief" not because counsel believed this would enhance the chances of success on appeal, but because of "considerable confusion." We are thus persuaded that, on this record, the fact that this case was submitted without oral argument for reasons unrelated to the interest of counsel's client fully supports the hearing court's finding of ineffective assistance of appellate counsel.[10]

■ This Court has previously held that a decision of a court in a case where appellant was without the effective assistance of counsel is not binding upon appellant. *See Commonwealth v. Cheeks,* 429 Pa. 89, 96–97, 239 A. 2d 793, 797 (1968). Therefore, where an appellant is denied the effective assistance of counsel on appeal, the proper remedy is to afford appellant a new appeal in which he may reassert the issues adversely affected by his initial counsel's ineffective stewardship of his appeal.

10. This conclusion is further compelled by the quality of the "briefs" filed in support of appellant's claims for relief. During the evidentiary hearing before the Post Conviction Hearing Court, Judge DiBona, chief trial counsel for Sullivan, testified that he did not file a brief with this Court. He stated that although a *rough draft* of a brief had been prepared he had no knowledge of its ever being filed. Mr. Peruto, who served as co-counsel during trial and sole counsel before this Court, also had no recollection of a brief being filed. Thus, although this rough draft was eventually presented to this Court as well as a brief prepared by the appellant propria persona, it is obvious that these documents did not represent the studied exposition of the difficult and complex issues raised in this trial which is required by our standards, particularly where the charges were as serious as those involved in this lawsuit.

Additionally, it must be concluded from the testimony presented during the Post Conviction Hearing that counsel made the decision to waive oral argument at a time that he was not aware that a brief had been filed on his client's behalf. Under such circumstances there is no conceivable basis for concluding the decision was made to effectuate the interests of the client.

*See Commonwealth v. Stone*, 437 Pa. 496, 264 A.2d 406 (1970); *Commonwealth v. Stein*, 436 Pa. 330, 260 A.2d 467 (1969); *Commonwealth v. Trowery*, 435 Pa. 586, 258 A.2d 499 (1969). Thus we believe the PCHA court granted the proper relief.

Having determined that this appeal is properly before us, we now consider the substantive claims presented therein.

## II.

■ Appellant concedes that the Commonwealth has proved all the essential elements of the murders except the identity of the perpetrator. He now contends that this alleged failure of proof is fatal to the conviction in that, as a matter of law, the evidence was insufficient to support the verdict. We disagree that the evidence adduced at trial by the Commonwealth, if believed, would not satisfy all elements of the crimes beyond a reasonable doubt.

The chief prosecution witness, one Francis McGrath was employed as a janitor at the union hall where the bodies were eventually discovered. On June 17, 1966, he arrived at work approximately 6:00 P.M. and parked his automobile in the lot adjacent to the building. At that time, he specifically observed two other vehicles on the premises. One was owned by appellant and the other was being used at the time by one Anthony DiPasquale. After alighting from his car, McGrath noticed appellant looking out onto the parking lot from the window of a second floor office normally used by other union officials. The witness then entered the building and proceeded to the second floor to commence his duties. Appellant was still seated by the window when McGrath entered that office. Sullivan inquired about the janitor's presence and instructed McGrath to wait until Sunday night to clean, since a union meeting was scheduled for that date and the building would require cleaning after the gathering.

McGrath ignored the suggestion and continued collecting the trash from the offices. The witness then took the refuse outside the building. When he returned, appellant was still seated at the window.

At this time, both Sullivan and McGrath observed John Gorey and Rita Janda arrive at the union hall in Gorey's car and enter the building. McGrath then began cleaning the conference room, located approximately 75 feet from Gorey's office. Shortly thereafter, Gorey appeared and had a brief conversation with McGrath. Immediately after Gorey left the conference room, appellant appeared in the doorway, through which Gorey had just passed, and again questioned McGrath about the cleaning and suggested he defer his activities until Sunday afternoon. During this brief conversation, Gregory Carchidi, another janitor, entered the conference room. No conversation ensued between Carchidi and Sullivan but Carchidi repeated appellant's urgings to leave the work until Sunday. Sullivan then left the room through the same door which Gorey had exited but Carchidi remained and seated himself behind the desk.

Within several minutes, the witness testified he heard sounds like firecrackers going off in rapid succession. McGrath started to question Carchidi about the disturbance but was abruptly instructed to "Get out of the building and don't say nothing" (sic). McGrath left the union hall and noticed four cars other than his own parked in the lot. These were recognized as belonging to DiPasquale, Gorey, Carchidi and appellant. McGrath drove off but returned to the premises within 15 minutes. Only Gorey's car remained in the lot. Upon re-entering the building, he found the offices closed, the conference room locked and the lights out.

The victims' bodies were discovered the following morning. Gorey had been shot four times and Janda six times, the shots being fired from close range. The ballistics studies established two separate guns were em-

ployed in the homicides but the weapons were never recovered.

Additional testimony disclosed that the telephone lines had been arranged so that regular incoming calls would ring in the room in which appellant was seated. A second line with a different call number had been prearranged by Gorey to ring in his office so that he could receive an anticipated call from Joseph Vernick at 7:00 P. M. One Irene Glenn testified for the Commonwealth that she dialed the regular union phone number about 6:15 P.M. that evening and a man answered identifying himself as Gorey. A scrap paper found in the wastebasket alongside the desk where appellant had been seated prior to the victim's arrival contained Ms. Glenn's name and telephone number. It was uncontested that the handwriting was that of appellant. Moreover, one Joseph Vernick testified that he called Gorey's office at a specially arranged time but received no answer despite his repeated attempts between 7:15 and 8:15 P.M. This evidence, coupled with the medical examiner's testimony, indicated that the time of death could have been approximately 7:15 P.M. At the close of the case-in-chief, no evidence was presented by the defense.

 In determining the sufficiency of the evidence the test is whether, accepting as true all of the evidence of the Commonwealth and all reasonable inferences arising therefrom, upon which, if believed, a finder of fact could properly have based its verdict, such evidence was sufficient in law to prove the elements of the crime in question beyond a reasonable doubt. *Commonwealth v. Segers*, 460 Pa. 149, 157, 331 A.2d 462, 466 (1975); *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651 (1973); *Commonwealth v. Williams*, 450 Pa. 327, 301 A.2d 867 (1973).

150

This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. Cox*, 466 Pa. 582, 353 A.2d 844 (1976). Moreover, it is not necessary that each piece of evidence be linked to the defendant beyond a reasonable doubt. It is only necessary that each piece of evidence include the defendant in the group who could be linked while excluding others, and that the *combination of evidence* link the defendant to the crime beyond a reasonable doubt (emphasis supplied). *Commonwealth v. Petrisko*, 442 Pa. 575, 580, 275 A.2d 46, 49 (1971). *See also, Commonwealth v. Tinsley*, 465 Pa. 329, 350 A.2d 791 (1976); *Commonwealth v. McIntyre*, 451 Pa. 42, 47, 301 A.2d 832, 834 (1973). Restated, the facts and circumstances need not be absolutely incompatible with defendant's innocence, but the question of any doubt is for the jury unless the evidence "be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances". *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943). *See also, Commonwealth v. Rogozinski*, 387 Pa. 399, 402, 128 A. 2d 28, 30 (1956).

An analysis of the facts supports the jury's findings. Sullivan had remained at the window looking out onto the parking lot for more than 20 minutes after McGrath's arrival, indicating that he was awaiting the arrival of a particular individual. Sullivan did not leave that observation point until he had seen the victims arrive, strongly suggesting that it was in fact Gorey and Janda whose arrival he was awaiting. The evidence further justifies an inference that Sullivan attempted to conceal his identity and presence by answering the telephone as "Gorey." Moreover, he attempted to persuade McGrath to leave the premises by repeatedly suggesting

that the cleaning be left until Sunday. Such conduct is highly consistent with an attempt to avoid the possibility of any witnesses to the anticipated event.

This conclusion is buttressed by the actions of Carchidi, a co-defendant, who entered the conference room and without engaging in discussion with appellant, also instructed McGrath to defer his duties until Sunday. Almost immediately thereafter, appellant exited the conference room through the same doorway which Gorey had previously departed, and which led towards Gorey's office, the scene of the murders. Momentarily, the shots were heard and Carchidi told McGrath to ". . . get out of the building and don't say nothing" (sic). A reasonable inference can be drawn that the repetition and similarity of these statements to McGrath by appellant and Carchidi just prior to the shootings was indicative of their knowledge of the impending incident and further evidenced their attempts to remove any potential witnesses to the crime.

Additional evidence of guilt may also be inferred from appellant's statements to police. During questioning several days after the murders, Sullivan denied being present at the building during the time of the shootings. This contradicted McGrath's statement which placed Sullivan in direct proximity to the crime only moments before its occurrence. Moreover, McGrath stated that when he left the building Sullivan's car was still parked in the lot.

As stated by our Court in *Commonwealth v. Sauders,* 390 Pa. 379, 388–89, 134 A.2d 890, 895 (1957):

> In *Commonwealth v. Bolish,* 381 Pa. [500] at page 524, 113 A.2d [464] at page 476, supra, the Court said: ". . . false or contradictory statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indica-

tory of guilt: *Commonwealth v. Lowry,* 374 Pa. 594, 601, 98 A.2d 733 . . ." See to the same effect: *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A.2d 743, supra; *Commonwealth v. Spardute,* 278 Pa. 37, 122 A. 161; *Commonwealth v. Danarowicz,* 294 Pa. 190, 144 A. 127; *Commonwealth v. Hadok,* 313 Pa. 110, 169 A. 111; *Commonwealth v. Karmendi,* 328 Pa. 321, 328, 195 A. 62; *Commonwealth v. Jones,* 341 Pa. 541, 19 A.2d 389; *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155; *Cathcart v. Commonwealth,* 37 Pa. 108, 113; *McMeen v. Commonwealth,* 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Johnson,* 162 Pa. 63, 29 A. 280; *Commonwealth v. Jones,* 297 Pa. 326, 146 A. 905.

▆▆ Appellant claims that this evidence fails to preclude the possibility that a third party committed the crime since the building was unlocked and several other individuals were known to be about. The Commonwealth concedes that the evidence does not exclude participation by anyone else. In fact, the testimony showed that two guns were used in the murders. However, appellant was the only known person on the second floor whose whereabouts were unaccounted for during the shootings. Moreover, it is not required that the prosecution exclude all possibility of a third party committing the act.

"If eyewitness testimony of the commission of a murder were necessary, or if the Commonwealth had to exclude the possibility of a third person committing the crime—which would, in reality, require an eyewitness or the capture of defendant "red-handed"—few murderers would ever be convicted, and society could not possibly be adequately protected. Moreover, even if a defendant was caught running away from the murder scene right after the murder, he would have to be acquitted under the "exclusion" theory because he could contend that he was running away in order to avoid suspicion or to escape from the unknown criminal's at-

tempt to murder him. In the *Sauders* case, in the *Bolish* case, in the *Homeyer* case, in the *Wentzel* case, [*Com. v. Wentzel,* 360 Pa. 137, 61 A.2d 309], in the *Danz* case, [*Com. v. Danz,* 211 Pa. 507, 60 A. 1070], in the *Boden* case, [*Com. v. Boden,* 399 Pa. 298, 159 A.2d 894], in the *Carey* case, [*Com. v. Carey,* 368 Pa. 157, 82 A.2d 240], and in *Commonwealth v. LaRue,* 381 Pa. 113, 112 A.2d 362, infra (to mention just a few) there were no eyewitnesses to the murder; the exact time of death was unknown; and any third party or unknown person could have committed the murder. Any refinements or distortion of the law such as defendant urges would not only require us to overrule a myriad decisions of this Court, but would make the protection of society in most cases realistically impossible."

*Commonwealth v. Kravitz,* 400 Pa. 198, 212–13, 161 A.2d 861, 868 (1960).

In *Kravitz, supra,* we concluded by determining that it is unnecessary for the Commonwealth to dispel all possibility of doubt provided the evidence, if believed, warrants a finding of guilt beyond a reasonable doubt. Here the Commonwealth concedes that the evidence did not foreclose the possibility of the participation of a third person to the shooting. In fact it was their theory that at least two persons had actually shot the victims. Nevertheless we are satisfied that the testimony offered to show that Sullivan was one of the participants was sufficient to sustain the verdict.

Finally, McGrath testified that he returned to the union hall some 15 minutes later and found only Gorey's car parked in the lot. Upon reentering the hall he discovered that all the offices which had previously been opened were closed, the door to the conference room locked and all lights put out. These circumstances are consistent with the inference that Sullivan and Carchidi had left shortly after McGrath's original departure. They obviously attempted to give the impression that the

crime was committed after the premises had been secured for the night and they had departed from the building.

While it is not contended by the Commonwealth that any of these facts standing alone would support a conviction, taken in concert with all reasonable inferences, they clearly justify the conclusion that appellant was linked to the crime beyond a reasonable doubt. *See Commonwealth v. Petrisko, supra; Commonwealth v. Tinsley, supra;* and *Commonwealth v. McIntyre, supra.*

Appellant next argues that he was denied an opportunity to challenge the array of the grand jury because 1) he was without the assistance of counsel at the time the indictments were presented; 2) he did not receive notice that the cause was to be presented to the October grand jury; and 3) he could not challenge the jury already impanelled. Our review of the record convinces us that these arguments are without merit.

On November 3, 1966, an inquest was held by the Medical Examiner of the City of Philadelphia. At this time appellant was represented by the late John Patrick Walsh, Esquire. However, following this hearing appellant alleges that he no longer retained the services of Mr. Walsh and was without counsel thereafter until late December, 1966. In support of this position appellant has offered an affidavit supplied by Mr. Walsh prior to his death. Our reading of this affidavit indicates that Mr. Walsh continued his representation of appellant until new counsel was appointed or retained. Having determined appellant had representation during this period we now consider whether said counsel had adequate notice of the presentments and an opportunity to challenge the array of the jury.

At the close of the proceedings before the Examiner the following findings were stated:

"In reviewing the records of the Office of the Medical Examiner and the testimony, I find that Rita Janda

and John Gorey died as a result of gunshot wounds of the head, and that the manner of death is homicide, at this stage of the Inquest.

"I find at this stage that there is sufficient evidence to hold John J. Sullivan, Gregory Carchidi, and Anthony DiPasquale for action of Court, and I will continue this hearing until further notice, such time as additional evidence comes before me."

Appellant argues that this language was unclear and hence insufficient to notify him that the case would be presented to the grand jury. We believe that a proper interpretation of this language taken in context indicates that further hearings were for the investigation of the possible complicity of others but that a determination had been made to hold John Sullivan for action of court. Moreover, we note the affidavit of Mr. Walsh which stated that he understood that Sullivan was being held for action by the grand jury.

Appellant next suggests that the defense was denied notice as to which grand jury the cause would be presented thereby violating the rule enunciated by our Court in *Commonwealth v. Collemacine,* 429 Pa. 24, 239 A.2d 296 (1968). In *Collemacine, supra,* we held that "Failure to notify the accused or his counsel that his case will be presented to a grand jury *other than that to which he was handed over* violates fundamental notions of Due Process" (emphasis added). The basis of the *Collemacine* doctrine was to prevent the presentments from being made to a panel at an indefinite time in the future, without knowledge to the accused, thereby precluding the opportunity for the defense to challenge the array of the jury. In the instant matter, the presentments were made to the jury already impanelled and therefore did not offend the principle announced in *Collemacine, supra. See also, Commonwealth v. Jones,* 456 Pa. 270, 318 A.2d 711 (1974). Moreover, there is no indication that an experienced counsel of the calibre of Mr.

Walsh was not aware that the matter had been handed over to jury then impanelled.

Additionally, we do not believe that the procedure employed denied this appellant an opportunity to challenge the array as provided by Pa.R.Crim.Pro. 203 which stated in pertinent part:

> "Either the attorney for the Commonwealth or Defendant who has been held to answer may challenge the array of the jurors or an individual grand juror. A challenge to the array must be made only on the ground that the grand jury was not selected, drawn or summoned substantially in accordance with law. An individual grand juror may be challenged on the ground that he is not legally qualified or that a state of mind exists on his part which may prevent him from acting impartially. *All challenges must be made before the jurors are sworn, unless opportunity did not exist prior thereto; in any event, a challenge must be made before the bill of indictment is submitted to the grand jury . . .*" Rule 203, Rules of Criminal Procedure, 19 P.S., Appendix. Adopted June 30, 1964 and effective January 1, 1965. (Emphasis added).

Since this jury was impanelled prior to the time of the presentment, appellant would not have been precluded from making a challenge prior to the submission of the bills had he attempted to do so. This however was not done. Although a period of 11 days elapsed between the inquest and the presentment, no challenge was made to the array of the jury nor did the defense attempt to delay the indictment for the purpose of interposing an objection. Rather, no action was taken until two months after the indictments were returned when appellant's new counsel moved to quash the indictments that had been returned. In *Commonwealth v. Dessus,* 423 Pa. 177, 224 A.2d 188 (1966), we held that Rule 203 required that an accused must be given sufficient opportunity to challenge the array before the presentments are handed

over to the grand jury.[11] In the instant case ample opportunity existed for appellant to assert his challenge. His failure to comply with the clear mandate of the rule precludes relief once the indictments were submitted to the panel. Accordingly, the court properly denied the motion to quash.

 Appellant next alleges error by the trial court for admitting into evidence color slides depicting the bodies of the victims. We disagree. Our law is well settled that the admission of this type of evidence is within the discretion of the trial court and absent an abuse of that discretion, there is no reversible error. *Commonwealth v. Woods,* 454 Pa. 250, 252, 311 A.2d 582, 583 (1973) ; *Commonwealth v. Dickerson,* 406 Pa. 102, 176 A.2d 421 (1962). Moreover, the proper test to be applied by a trial court in determining the admissibility of photographs in homicide cases is whether or not the photographs are of such evidentiary value that their need clearly outweighs their likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Powell,* 428 Pa. 275, 278–79, 241 A.2d 119, 121 (1968). However, such photographs will not be excluded merely because they are unpleasant or gruesome. *Commonwealth v. Scaramuzzino,* 455 Pa. 378, 381, 317 A.2d 225, 226 (1974) ; *Commonwealth v. Snyder,* 408 Pa. 253, 257, 182 A.2d 495, 496 (1962).

 In the instant case, the Commonwealth's theory, substantiated by ballistic evidence was that the victims were killed by shots from two different weapons and that each person was hit by shots from both guns. Reconstructing the shooting through these slides the prosecution sought to prove that neither victim could have shot the other, that Gorey was the principal target and

11. On May 12, 1967, the Rule was amended wherein it specifically provided for a period of at least 10 days between the time an accused is held for court and the presentment to the grand jury. *See* Pa.R.Crim.P. 203(c).

Janda was shot while she was attempting to hide beneath her desk to avoid the existence of a witness to the killing of Gorey. Thus, the evidence was offered to aid the jury in understanding the physical scene of the crime, the nature and extent of the wounds inflicted and the brutality of the murder to graphically demonstrate the existence of an intent to take life.

> " 'In the trial of criminal cases photographs of the victim and of the scenes of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any connection defendant had with it . . .' " *Commonwealth v. Petrakovich,* 459 Pa. 511 at 522, 329 A.2d 844 at 849.

*See also, Commonwealth v. Robinson,* 433 Pa. 88, 249 A. 2d 536 (1969); *Commonwealth v. Boden,* 399 Pa. 298, 307–308, 159 A.2d 894, 899 (1960). Given the nature of the crimes, we believe the photographs helped to supplement the pathologist's complex and intricate testimony and had essential evidentiary value.

■ Appellant further contends that the slides were unnecessary because the defense was willing to stipulate to the evidence concerning the cause of death. This however is not a basis for excluding the evidence.

Finally, we hold that a defendant may not render evidence which is necessarily a part of the Commonwealth's case irrelevant and inadmissible merely by offering to stipulate. Specifically, photographs which would otherwise be of essential evidentiary value cannot be rendered inadmissible because of a stipulation (by one who does not admit to the crime) that the murderers had specific intent and premeditation. The Commonwealth, with its burden of establishing guilt beyond a reasonable doubt, may not be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce.

*Commonwealth v. Bonomo*, 396 Pa. 222, 151 A.2d 441
(1959); *Commonwealth ex rel. Butler v. Rundle*, 429
Pa. 141, 239 A.2d 426 (1968); see also, *State v. Jensen*, 209 Or. 239, 296 P.2d 618 (1956), appeal dismissed 352 U.S. 948, 77 S.Ct. 329, 1 L.Ed.2d 241. *Commonwealth v. Sullivan*, 446 Pa. 419, 437–38, 286 A.2d 898, 905 (1971).

Having reviewed the slides and considered the trial court's cautionary instructions to the jury, we conclude there was no abuse of discretion in the admission of these photographs.

██ It is next argued that the trial court improperly admitted hearsay statements into evidence. Specifically, appellant alleges that McGrath should not have been permitted to testify that immediately after the shootings Carchidi stated, "Get out of here and don't say nothing," (sic). This statement was offered by the Commonwealth to establish that the declarant was a co-conspirator and aware that the sounds were actually gunfire caused by the shooting of the victims. After lengthy discussion as to the admissibility of the statement, the witness was permitted to testify concerning Carchidi's remark. The lower court permitted the evidence on several bases: 1) that it was admissible under the co-conspirator's declaration exception to the hearsay rule, 2) that it was admissible under the res gestae exception to the hearsay rule, and 3) that even if the statement was improperly admitted, it was not prejudicial to appellant.

 In our view, the statement was properly admitted under the co-conspirator's declaration exception to the hearsay rule. Under this doctrine, if a conspiracy has been established, each conspirator represents the other with respect to the act to be accomplished and everything said or done by any of them in pursuance of the common purpose is admissible against all. 1 Henry, *Pennsylvania Evidence* § 442, p. 436 (1953). The least

degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all and the showing of the conspiratorial design does not necessarily involve participation in every detail as long as he was an active partner in the intent which was the crime's basic element. *Commonwealth v. Strantz*, 328 Pa. 33, 40–42, 195 A. 75 (1937); *Commonwealth v. Rife*, 454 Pa. 506, 510–11, 312 A.2d 406, 408 (1973). As previously noted, Carchidi was present in the building during the time of the incident. Although employed as a janitor he was not performing any duties related to his position and it could have been inferred that his purpose for being there was for reasons other than his normally assigned tasks. Further, he also attempted to convince McGrath to leave the premises and do the cleaning another day. After the sounds of the shootings he did not immediately depart the premises but remained in the conference room. This conduct was consistent with one who was privy to the events which had transpired. In our view there was sufficient circumstantial evidence from which a conspiracy with Sullivan could have been inferred, *Commonwealth v. Eiland*, 450 Pa. 566, 570, 301 A.2d 651, 652 (1973), and therefore the statement was properly admitted.

In view of our agreement with the trial court that the statement was properly admitted on the ground of a declaration by a co-conspirator we need not consider the other bases offered by the trial judge to justify its introduction into evidence.

 Appellant next presents numerous claims that he was denied his right to effective assistance of trial counsel. Initially we recognize that a presumption exists that counsel is competent, *Commonwealth v. Murray, supra*, 452 Pa. at 286, 305 A.2d at 36; *Commonwealth ex rel. Washington v. Maroney, supra;* and a claim of ineffectiveness will not be successful unless it is sustained by the record or other credible evidence. In

passing upon the claim of ineffective assistance, the single question is whether counsel's choice of strategy had some reasonable basis designed to effectuate his client's interests. *Commonwealth v. Hudson,* 455 Pa. 117, 124, 314 A.2d 231, 235 (1974); *Commonwealth ex rel. Washington v. Maroney, supra,* 427 Pa. at 604, 235 A.2d at 352. Thus counsel is deemed constitutionally effective once we conclude that the particular course chosen was in the interest of the client and we will not substitute hindsight evaluation of the record to retrospectively determine whether counsel's decision was reasonable. *Commonwealth v. Hill,* 450 Pa. 477, 482, 301 A.2d 587, 590 (1973).

Appellant first claims that he was denied effective assistance of trial counsel because his attorneys also represented two co-defendants who were tried separately for the crime. To prove ineffectiveness on this ground, it is necessary to establish that 1) there was dual representation and 2) as a result, a conflict of interest developed. *Commonwealth v. Breaker,* 456 Pa. 341, 318 A.2d 354 (1974). Dual representation alone does not amount to a conflict of interest. *Commonwealth v. Breaker, supra; Commonwealth v. Wilson,* 429 Pa. 458, 240 A.2d 498 (1968); *Commonwealth ex rel. Corbin v. Myers,* 423 Pa. 243, 223 A.2d 738 (1966), cert. denied, 386 U.S. 1013, 87 S.Ct. 1361, 18 L.Ed.2d 445 (1967).

Upon review of the record from the PCHA proceedings, we find appellant has failed to prove the requisite elements of his claim. First, the testimony establishes that there was no dual representation in the true sense of the term, i. e., the same counsel actively represented co-defendants. Mr. Peruto testified that it was Mr. (now Judge) DiBona who served as chief counsel for appellant during trial and made all decisions relevant to Sullivan's defense while he, Peruto, was merely assisting. These functions were reversed at the trial of the co-de-

fendants where Mr. Peruto was chief counsel and Judge DiBona the assistant. Thus, Judge DiBona served only a minor role in the trial of the co-defendants while devoting his primary efforts to the Sullivan case. This conclusion is supported by Judge DiBona's statements that his stewardship was in no way affected by the consideration of the co-defendant's cases but was solely a product of what he considered to be the best course in his representation of Sullivan. We therefore hold that there is absolutely no evidence that a conflict existed.

Appellant next asserts the decision by defense counsel not to present any evidence or permit appellant to testify on his own behalf constituted ineffectiveness. The decision not to present a defense is a tactical one and will not be deemed ineffective stewardship if there is a reasonable basis for that position.

In the instant case, Judge DiBona believed that there was insufficient evidence upon which to convict Sullivan. He therefore refrained from calling any defense witness to avoid the possibility of exposing them to cross-examination through which the prosecution might have extracted those elements necessary to complete their proof. *See Commonwealth v. Dancer, supra.* In view of the close question of the sufficiency of the evidence on this record, we find that the course chosen by Judge DiBona could not be termed unreasonable.

Additionally, it is contended that at the commencement of trial and out of the presence of the jury, the prosecution delivered a memorandum to the trial court, the contents of which were not made known to the defense. Counsel argued that he was entitled to be apprised of the contents of the memo but that the court denied the request. The failure to press this objection at post trial motions is now assigned as a basis for this ineffective assistance claim. In reviewing this claim of ineffectiveness we must consider whether there was some

reasonable basis for not pursuing the objection. As stated in *Commonwealth ex rel. Washington v. Maroney, supra,* 427 Pa. at 605 n. 8, 235 A.2d at 353 n. 8 "a finding of ineffectiveness could never be made unless we concluded that the alternatives not chosen offered a potential for success substantially greater than the tactics actually utilized." The record indicates that the memorandum contained a request for a continuance to afford the Commonwealth an opportunity to test fire certain weapons to determine whether they were used in the perpetration of the homicides. The request was granted and the tests were made.

At trial, the ballistics expert testified that he had test fired certain guns during his investigation and found that these weapons were not used to commit the crimes herein involved. Thus, not only was the objection not addressed to the propriety of the trial court's ruling permitting the witness to examine the weapons, the actual results were not harmful to the defense.

 The thrust of the objection was directed to a private communication between court and prosecution from which the defense was excluded. While we do not condone such a practice we do not find that any prejudice to appellant resulted in this case. For this reason it is clear that if counsel had pressed this objection on appeal it would not have justified the award of a new trial. Thus counsel cannot be found to be ineffective for failing to preserve an objection which had no probability of success. *Commonwealth v. Rice,* 456 Pa. 90, 318 A.2d 705 (1974).

 Moreover, we cannot accept the contention that the failure of the Commonwealth to make available to the defense these reports in any way violated appellant's due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady, supra* requires the prosecution to furnish the defense evidence on

demand which would tend to exculpate him or reduce the degree of penalty. As indicated above, the information was introduced during trial and the defense had the opportunity of using it in any manner it deemed appropriate.

It is also claimed that trial counsel's failure to preserve an objection to the trial court's denial of a request for additional alleged *Brady* material constituted ineffective assistance of counsel. Specifically Sullivan contends that the prosecution's chief witness, one Francis McGrath had made various contradictory statements to one Detective McGill during the course of an interview at police headquarters. It is appellant's position that he was prevented from learning of this information until after the close of the trial and therefore precluded from subpoenaing the detective as a defense witness. There is however, absolutely no factual basis for this assertion. On the contrary, the record establishes that defense counsel learned of the interview with McGill during his cross-examination of McGrath.

Q You went there on Sunday, rather, June 19th, is that right?

A That is right.

Q And that is the time you talked to Detective Duffy, is that right?

A ' Duffy.

Q Then you went back on June 21st, the Monday is that right, sir . . . I am sorry, the 20th?

A The 20th, that is right.

Q Who did you talk to then, by the way?

A I talked to Detective McGill, Detective Brooks. I talked to McGowen. I talked to Lt. Matthis. That is about all I can remember, who I talked to.

Despite the information elicited from this witness, defense counsel never attempted to subpoena McGill as a

witness nor did they request any notes that might have been taken by McGill of his conversation with McGrath. While *Brady* requires the prosecution to provide the defense upon request with material in its possession which would be beneficial to the defendant, the record here reflects that there was no request for such information. Hence, there was no *Brady* violation for trial counsel to preserve.

 Nor do we believe that the failure to introduce these alleged inconsistent statements from the interview constituted ineffective stewardship. As stated in appellant's brief, the statements related only to the question of Carchidi's guilt or innocence. There is however, no assertion that these statements had any direct bearing upon the innocence of this appellant. Thus, the only purpose to be served by the introduction of the remarks would have been to impeach McGrath's credibility as a witness in the eyes of the jury. The extent to which defense counsel chooses to pursue a collateral issue is clearly a matter of judgment. Upon review of the record we are satisfied that the defense explored the issue as well as he deemed profitable. During the course of the trial, McGrath was skillfully cross-examined by experienced counsel concerning various inconsistent remarks made to the police, at the Medical Examiner's inquest and to other individuals. These variations were strenuously argued to the jury as an attack upon the witness' credibility. Having attempted to impeach the credibility of the witness, we are convinced that counsel's stewardship was not ineffective merely because he did not expose every arguable inconsistency in McGrath's testimony.

 Appellant next presents several arguments pertaining to trial counsel's alleged ineffectiveness for failing to raise timely objections to the court's charge to the jury. Initially, Sullivan contends it was error for the court to express his opinion as to the degree of guilt involved in the crime. We disagree. As previously noted,

the test for determining effectiveness of counsel is based upon the reasonableness of his representation at time of trial. *Commonwealth v. Hill, supra,* 450 Pa. at 482, 301 A.2d at 590. At the time of Sullivan's trial, the law permitted the trial judge to express his opinion in the case.[12]

". . . it is always the privilege and sometimes the duty of a trial judge to express his own opinion, including his opinion of the weight and effect of the evidence or its points of strength and weakness or even the guilt or innocence of the defendant and the verdict which, in his judgment, the jury should render." *Commonwealth v. Ott,* 417 Pa. 269, 272–73, 207 A.2d 874, 876 (1965) quoting *Commonwealth v. Chambers,* 367 Pa. 159, 164, 79 A.2d 201, 204 (1951).

*See also Commonwealth v. Wilmer,* 434 Pa. 397, 254 A.2d 24 (1969).

Moreover, this opinion or comment was required to be fairly or temperately stated, clearly leaving the jury free to reach its independent conclusion. *Commonwealth v. Raymond,* 412 Pa. 194, 208, 194 A.2d 150, 157 (1963);

---

12. In support of his position, appellant relies upon our decisions in *Commonwealth v. Archambault,* 448 Pa. 90, 290 A.2d 72 (1972) and *Commonwealth v. Goins,* 457 Pa. 594, 321 A.2d 913 (1974), both of which were decided several years after Sullivan's trial. However, even assuming arguendo these decisions apply retroactively and that counsel should have possessed the foresight to anticipate them, we believe this reliance is misplaced. In *Archambault, supra,* we announced a new rule that the trial judge could no longer express an opinion as to the guilt or innocence of an accused. There is no evidence that the trial judge expressed such an opinion with respect to Sullivan and thus that case is inapplicable. In *Goins, supra,* the accused had admitted committing the homicide but asserted the defenses of intoxication and insanity in an effort to lessen the degree of guilt. Four members of this Court expressed the view that it was inappropriate for the court to comment upon the degree of guilt where that was the only issue for the jury to decide. *See Commonwealth v. McNeill,* 462 Pa. 438, 341 A.2d 463, 465 (1975). Sullivan however conceded at trial that the crime amounted to first degree murder but based his defense upon the theory that the evidence was insufficient to establish his guilt. Thus the principle announced in *Goins, supra* is likewise inapplicable here.

*Commonwealth v. Watts,* 358 Pa. 92, 97, 56 A.2d 81, 83 (1948).

We believe this test was satisfied. After his comments, the court repeatedly reminded the jurors that he was merely stating his opinion, the remarks were not binding upon them and that the ultimate determination of the facts and the verdict was solely that of the panel.

 Additionally, appellant suggests the court's instructions improperly emphasized certain evidence and did not fairly state all the possible verdicts in the case thereby usurping the jury's fact-finding function and directing them toward a first degree murder conviction. These objections however fail to assess the court's remarks in their proper context. Having reviewed the charge in its entirety as we must, *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600 (1973), we find that the charge presented a fair discussion of the evidence. Moreover, the jury was properly instructed on all possible verdicts and received adequate instructions on the applicable law. For these reasons we find that the charge was proper and therefore there was no necessity for counsel to object.

 Appellant's final contention is that trial counsel was ineffective for failing to object to the introduction of evidence that Sullivan had exercised his right to remain silent until he had obtained counsel. However, we need not reach the merits of this claim. Although this ground for relief was alleged in the amended PCHA petition, it was not pursued at the time of the hearing nor was it discussed in the brief to the hearing court. Accordingly we will not consider the question on appeal. *Commonwealth v. Bowen,* 455 Pa. 152, 314 A.2d 24 (1974).

In the appeal at No. 127, the Order of the Court granting leave to file a direct appeal to this Court is affirmed.

In appeals at Nos. 121 and 122, Judgments of sentence affirmed.

EAGEN, J., dissents in the appeal docketed at No. 127 and would reverse the order of the Court of Common Pleas granting the right to appeal nunc pro tunc. In appeals docketed at Nos. 121 and 122, he concurs in the results.

ROBERTS, J., files a concurring and dissenting opinion in which MANDERINO, J., joins.

POMEROY, J., files a concurring and dissenting opinion, in which O'BRIEN, J., joins.

MANDERINO, J., files a concurring and dissenting opinion, in which ROBERTS, J., joins.

ROBERTS, Justice, concurring and dissenting.

I agree with the majority that the Post Conviction Hearing Court properly granted appellant, John Sullivan, a new direct appeal. I join in part I of the majority opinion.

I cannot agree, however, with the majority's conclusion that the evidence presented at trial was sufficient to sustain a conviction of murder of the first degree. I would reverse the convictions and order appellant discharged.

I must also dissent from the majority's decision that the trial court committed no error when it admitted into evidence thirty-nine color slides of the victims. These slides were inflammatory, and of no evidentiary value. Their presentation to the jury deprived appellant of a fair trial.

I.

## The Evidence was Insufficient to Support Appellant's Conviction.

The evidence presented at trial, viewed in the light most favorable to the Commonwealth, was as follows: The bodies of John Gorey and Rita Janda were discovered on June 18, 1966, in Gorey's office in the Headquarters of Teamsters Union Local 107. Both had been shot several times. The Commonwealth established that two weapons had been used in the homicides, that the wounds inflicted were the cause of death, and that the time of death was sometime in the early evening of June 17, 1966.

The Commonwealth's most important witness was Francis J. McGrath, a janitor at the local and a member of the union. McGrath arrived at the local's office building at about 6:00 p. m. While outside the building, McGrath saw Sullivan looking out a window of an office Sullivan usually did not use. McGrath entered the building and began cleaning. In the course of his chores, he entered the office in which Sullivan was seated. Sullivan asked McGrath why he was working on Friday, McGrath's day off, and told him to defer his cleaning duties until after a union meeting scheduled for that Sunday so that the building would be clean for the opening of business on Monday. McGrath ignored the advice and continued his activities.

About 6:15 p. m., McGrath re-entered the office in which Sullivan was seated to empty some trash cans, and he and Sullivan observed Gorey and Janda arrive at the building.

McGrath began cleaning the local's conference room. Gorey entered the room, exchanged a few words with the janitor and left. A few minutes later Sullivan entered the conference room using the same door through which

Gorey had exited. Sullivan again suggested that McGrath postpone his duties until Sunday. Meanwhile, Gregory Carchidi, another janitor entered the room but exchanged no greeting with Sullivan. Carchidi also suggested that McGrath wait until Sunday to complete his chores. Shortly thereafter, Sullivan left the conference room by the same door Gorey had used. McGrath stated on cross-examination that he was unable to see whether after Sullivan left the office he proceeded down the hall toward Gorey's office or had gone in a different direction.

After Carchidi again mentioned McGrath's cleaning, McGrath heard what sounded to him like a package of firecrackers going off sequentially. McGrath asked Carchidi, "What was that?" Carchidi replied, "Get out of the building and don't say nothing."

McGrath promptly left the building, stopping only to note that Sullivan's, Carchidi's, Anthony DiPasquale's and Gorey's cars were parked near the building, and to talk with a group of men standing outside the building. He returned about 15 minutes later and found that the offices had all been locked, the lights turned off and the building deserted. He removed any evidence indicating that he had been in the building and left.

The Commonwealth also called Irene Glenn. Glenn testified that at about 6:15 p. m., June 17, 1966, she telephoned the union to discuss the local's efforts to organize the company at which she was employed. She testified that the man who spoke to her identified himself as Gorey. The prosecutor played a tape recording of Gorey's voice for her but she was unable to identify the recorded voice as the one she had heard on the telephone. She did not testify that Sullivan's voice was the one she heard on the telephone. The Commonwealth introduced into evidence a piece of paper found in a waste paper basket upon which Glenn's name and phone number were written in Sullivan's handwriting.

Further evidence was introduced which showed that during the investigation, Sullivan denied that he was in the building at the time of the murder.

The defense demurred to the Commonwealth's evidence and offered no evidence on its own.

"The test of the sufficiency of the evidence is whether, accepting as true all the evidence and all reasonable inferences therefrom upon which if believed the jury could have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime for which he has been convicted." *Commonwealth v. McFadden,* 448 Pa. 277, 281, 292 A.2d 324, 326 (1972) ; see e. g., *Commonwealth v. Murray,* 460 Pa. 605, 608, 334 A.2d 255, 257 (1975).

Here, the Commonwealth relies totally on circumstantial evidence. Of course, circumstantial evidence in itself may be sufficient to establish both the commission of a crime and the accused's participation if the inferences arising from the evidence establish these facts beyond a reasonable doubt. *Commonwealth v. Cox,* 460 Pa. 566, 333 A.2d 917 (1975); *Commonwealth v. Alston,* 461 Pa. 664, 337 A.2d 597 (1975). However, a conviction based on suspicion and conjecture cannot stand. *Commonwealth v. Garrett,* 423 Pa. 8, 222 A.2d 902 (1968) ; *Commonwealth v. Clinton,* 391 Pa. 212, 218–19, 137 A.2d 463, 466 (1958).

The Commonwealth argues that from the evidence adduced at trial the jury could infer that Sullivan was in the building at the time of the killing, that he sat by the window watching for Gorey and Janda to arrive, and that there were only two other people, Carchidi and McGrath in the building at the time of the killing.

Furthermore, the Commonwealth urges that the evidence that Sullivan left the building shortly after the shooting and that he denied to the police that he was present in the building show that he tried to conceal his

knowledge of the crime and this supports an inference of guilt.

I cannot agree with the majority that the evidence and the inferences the Commonwealth seeks to draw from it are sufficient to establish beyond a reasonable doubt that Sullivan was guilty of murder.[1] To convict, the jury would have to believe that after leaving the conference room, Sullivan followed Gorey into his office and then took part in the murders.[2] The police department laboratory technicians were unable to uncover any of the scientific evidence that is often used to prove circumstantially that the accused committed the crime. The murder weapons were never discovered and thus there was no evidence indicating that they had ever been in Sullivan's possession. No fingerprints, shreds of clothing, or other physical evidence were found in the room where the murder occurred which could support an inference that Sullivan had been in the room when the murders were committed. Finally, nothing found on Sullivan's person or effects afford an inference that he was present. Compare *Commonwealth v. Dawson*, 464 Pa. 254, 346 A.2d 545 (1975) (Eagen, J.) ;[3] *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960).

1. The six justices of this Court who heard appellant's first appeal were evenly divided on the issue of the sufficiency of the evidence to support conviction. Mr. Justice (now Chief Justice) Jones, Mr. Justice O'Brien, Mr. Justice Pomeroy were in support of affirmance of appellant's conviction. Chief Justice Bell, Mr. Justice Eagen, and this writer would have reversed the judgment against appellant, and ordered his discharge, because there was insufficient evidence to support the conviction. *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1971).
 Appellant's co-defendants, tried separately, were both acquitted.

2. Because the record is devoid of any evidence that Sullivan was a member of a conspiracy to murder Gorey and Janda, a guilty verdict could only be returned if the jury found Sullivan actually took part in the murder.

3. In *Commonwealth v. Dawson*, the deceased had been bludgeoned and shot to death. The police found in appellant's car a blanket, hatchet handle and other items, all of which were stained with blood of decedent's blood type. Also found in the

Furthermore, many of the inferences the Commonwealth urges that the jury could have drawn are either based on no evidence at all, or are so conjectural that they cannot support a conviction.

The Commonwealth places great weight on the fact that besides Gorey and Janda, McGrath saw only Carchidi and Sullivan in the building prior to the shooting. However, the record reveals that at the time of the murder the doors to the building were unlocked, that at a time shortly after the shooting several persons were standing outside the building, and that persons could enter the building without being seen by McGrath. There is no evidence that McGrath looked in every office in the building while he was cleaning, and it thus is entirely possible that there were others in the building when McGrath entered. In these circumstances mere presence in the office building is insufficient to support an inference of guilt. *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1968).

Moreover, flight from the scene of a crime is not enough to prove complicity. *Commonwealth v. Bailey*, 448 Pa. 224, 292 A.2d 345 (1972). Flight is just as consistent with fear as with guilt, id., and appellant's "flight" consisted of no more than leaving the building, as did others. Indeed, in this case, the very witness upon whom the Commonwealth most heavily relies fled from the scene of the crime and thereafter made careful efforts to cover up the fact that he had been in the building at the time of the shooting.

Furthermore, the inference that because Sullivan was seated at the window overlooking the parking lot, he was waiting for Gorey and Janda is nothing more than speculation.

car were spent cartridges of the same caliber as the bullets removed from the deceased's body. We held that this evidence together with other circumstantial evidence was sufficient to sustain a conviction for murder in the second degree.

I have reviewed the entire 1,300 page record of Sullivan's trial and am completely satisfied that the evidence of Sullivan's participation in the crime is either nonexistent or so weak and inconclusive that as a matter of law the inferences of fact necessary to establish guilt beyond reasonable doubt could not be reasonably drawn. In this case, the pyramiding of inferences, many of which were of dubious probability in the first place, made impermissible a finding by the jury that, beyond a reasonable doubt, Sullivan committed the crimes charged. The evidence was insufficient to establish guilt beyond a reasonable doubt.

The judgments of sentence should be reversed and appellant should be discharged.

## II.

### The Color Slides of the Victims should not have been Admitted into Evidence.

Appellant's conviction should be reversed because there is insufficient evidence to support his convictions, and it therefore is unnecessary to address the other issues decided by the majority. However, in view of the majority's holding that the color slides of the victims were properly admitted and shown to the jury, I must express my dissent on that issue.

Thirty-nine color slides were admitted at trial over defense objection. I have viewed these slides. Their inflammatory content is accurately described in the Concurring and Dissenting Opinion of Mr. Justice Manderino, which I join, although it is difficult to fully comprehend their prejudicial impact without actually seeing them. When this case was first before this Court, Mr. Justice Pomeroy described the slides as "repulsive, showing not only close-ups of the contorted bodies of the two deceased persons lying in pools of blood, but also close-ups of the bullet holes in the heads and other portions of

the anatomies of the victims." *Commonwealth v. Sulli-van*, 446 Pa. 419, 435, 286 A.2d 898, 904 (1971). (Opinion in Support of Affirmance) (Opinion of Pomeroy, J., joined by Jones and O'Brien, JJ.). Each of the slides was shown to the jury for approximately thirty seconds.

The proper test for determining the admissibility of this type of photographic evidence "is whether or not the photographs are of *such essential evidentiary value* that their need *clearly outweighs* the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Powell*, 428 Pa. 275, 278–79, 241 A.2d 119, 121 (1968) (emphasis added); accord, *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974).[4] Applying this test, it is clear that the gruesome nature of these photographs created a "substantial likelihood of inflaming the minds and passions of the jurors." Since these pictures were of no evidentiary value, and certainly did not have "essential evidentiary value," they should not have been admitted.

The majority asserts that this photographic evidence was admissible to prove that the two victims were killed with an intent to kill. But the Commonwealth had ballistic evidence showing that each of the victims had been shot by each of two firearms. Janda was shot six times, Gorey three times, all at close range. I cannot believe that a jury needs photographic evidence, in addition to

**4.** In *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974), the majority decided that the test announced in *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 119 (1968), applies only after it is first determined that the photographs have inflammatory characteristics. This writer dissented, contending that if the pictures in question are not inflammatory, this is merely a factor to be considered in applying the *Powell* test. *Commonwealth v. Petrakovich*, 459 Pa. 511, 526, 329 A.2d 844, 851 (1974) (Dissenting opinion of Roberts, J., joined by Manderino, J.). Even under the view announced by the majority in *Petrakovich*, however, the *Powell* test applies, because the color slides shown in this case were inflammatory. Mr. Justice Manderino in his Concurring and Dissenting opinion correctly labels the slides as a "horror show" including "full color slide photographs of blood smeared bodies, with bullet riddled faces, lying in literal pools of blood."

the Commonwealth's uncontradicted ballistic evidence, to be convinced that a person shot six times at close range was shot with an intent to kill.[5]

The majority also asserts that the slides helped to supplement the pathologist's testimony. Appellant did not question the nature and cause of death, however, and when the pathologist was asked whether there was anything questionable about "his findings" which the photographs might clarify, he replied "I would say no."

Thus, on this record the color slides had no evidentiary value. They were not needed to clarify the pathologist's testimony, and were of no value in proving intent to kill. Other uncontradicted evidence available to the Commonwealth, and offered at trial, was more than adequate to prove the cause of death, and that the killings were made with an intent to kill. Given the availability of these alternative sources of evidence, the pictures did not have "essential evidentiary value."

Moreover, appellant offered to stipulate that the killing was in the nature of an execution, and that whoever committed the killing was guilty of murder of the first degree. In light of this stipulation, the pictures could not possibly have any evidentiary value.

The majority asserts that appellant's offer to stipulate cannot deprive the Commonwealth of its right to prove its case by the most convincing evidence available.[6] I

5. The majority asserts that the slides also might aid the jury in understanding the location of the bodies, to rule out the possibility that Janda and Gorey shot each other. This possibility is completely rebutted by ballistic evidence that each victim was shot by each of the weapons. Moreover, the location of the bodies could be established by other testimony, including that of the photographer, and the physical scene of the crime could have been depicted by a picture of the room taken after the bodies had been removed.

6. In support of this proposition, the majority relies on *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1971) (Opinion in Support of Affirmance) (Opinion of Pomeroy, J., joined by Jones and O'Brien, JJ.), which did not express the views of a majority of this Court. Moreover, the proposition that a stipulation can-

fail to see how these pictures, offered as circumstantial evidence that the killing was murder of the first degree, are more convincing than a stipulation to the legal conclusion they were offered to prove. If they are more "convincing," it is only because their inflammatory nature might lead a jury to convict appellant, even though the prosecution had not proved beyond a reasonable doubt that appellant was the one responsible for these gruesome killings.

Application of the standard governing admissibility of photographs requires careful examination of the purposes for which they are offered, and the alternatives available to the Commonwealth. Photographs are not automatically admissible whenever the Commonwealth asserts they might help prove a specific intent to kill, or that they might help to clarify the pathologist's testimony. Unless the probity of the particular pictures offered is carefully considered, and the alternative sources of proof are given proper consideration, these assertions become legal fictions by which the standard set out in *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 119 (1968), is circumvented.

The admission into evidence of the thirty-nine color slides of the victims, in the absence of any need to have the jury see this evidence, deprived appellant of a fair trial. Appellant's conviction should be reversed, and a new trial ordered, on this ground.

Accordingly, while I agree with the majority that the order granting appellant a new direct appeal should be affirmed, 1 must dissent from the majority's decision to affirm the conviction.

not render the Commonwealth's "most convincing evidence" inadmissible misapplies the test set out in *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 199 (1968). Even if the photographs are slightly more convincing, the stipulation offered may be an adequate substitute, so that the photographs no longer have "such essential evidentiary value" as to "clearly outweigh" their prejudicial effect.

MANDERINO, J., joins in this concurring and dissenting opinion.

POMEROY, Justice, concurring and dissenting.

By entertaining the present appeal at No. 121 the Court, in my judgment, turns Pennsylvania appellate jurisprudence in criminal cases on its head, and seriously compromises the integrity of the appellate process. The salutary procedures of post-conviction relief have been misapplied so as to wipe out, by the well-meaning but misguided order of a common pleas judge, a decision of and opinions previously filed by this Court. More specifically, this Court has been told by the common pleas court—which the majority now says had the right so to do—that the legal counsel who represented the defendant in his earlier appeal to this Court was ineffective in that representation, and that therefore the trial court is granting the defendant the right to file a new direct appeal, nunc pro tunc, from the judgments of sentence. This unprecedented procedure produces, moreover, the bizarre spectacle of the defendant being granted by the trial court something he had previously been twice denied by this Court, viz., a reargument of his direct appeal. Thus by the stroke of the pen of a court of inferior jurisdiction is prior appellate action in the same case rendered nugatory.

As Mr. Justice ROBERTS has well said in a similar context, "It is evident that the orderly administration of justice requires that a criminal controversy, like any other litigation, [must] some day come to an end." *Commonwealth v. Slavik*, 449 Pa. 424, 432, 297 A.2d 920, 924 (1972). See also *Commonwealth v. Beecham*, 450 Pa. 197, 299 A.2d 651 (1973). By refusing to declare that this litigation came to an end at least as long ago as 1973, the Court ignores its own wise teaching. It is for this reason, more fully explicated below, that I must dissent from part I of the Court's opinion. If, however, I

were to allow the direct appeal from the judgment of sentence, I would affirm, as the Court does. I also agree that appeal from the post-conviction court's order is without merit.

## 1. *Procedural Background*

A somewhat more detailed recital of the relevant history of the case is necessary to an understanding of the jurisprudential issue. After John Sullivan had been convicted by a jury in 1967 of two counts of murder in the first degree for the deaths by shooting of John Gorey and Rita Janda, post-trial motions were filed and denied by a court en banc.[1] A direct appeal to this Court was then taken. With two exceptions, the various points asserted as reasons for a new trial in the trial court were reasserted on appeal,[2] and the lack of sufficient evidence to convict was reasserted as ground for arresting the judgment. These several contentions were considered by this Court and dealt with in detail in the opinion in support of the order affirming the judgments of sentence. See *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1969).[3]

1. The court en banc consisted of Judge Barbieri, the trial judge, Judge Greenberg and Judge Bradley of the Court of Common Pleas of Philadelphia County. The court was unanimous in denying the motion in arrest of judgment; Judge Bradley noted his dissent from the order denying the motion for a new trial.

2. On appeal no claim was made, as it had been post-trial, that the trial judge had erred in his charge to the jury or that the Commonwealth had concealed evidence favorable to the defendant.

3. This opinion, authored by the present writer, was joined by Mr. Justice (now Chief Justice) JONES and Mr. Justice O'BRIEN. Mr. Chief Justice BELL and Mr. Justice EAGEN noted their dissents on the ground that the evidence was insufficient to convict. Mr. Justice ROBERTS wrote a dissenting opinion in which he expressed the view that the evidence was insufficient and that prejudicial error had been committed in allowing certain photographs to be introduced into evidence. The death of Mr. Justice COHEN before a decision of this Court was reached occasioned the equal division of the Court.

Appellant, through new counsel (who continues to represent him), then filed a petition for reargument.[4] This petition identified some eight respects in which the Court (i. e., the opinion in support of affirmance) had allegedly misunderstood the evidence or misapplied the law. In a concluding paragraph it was suggested that the evidence of the Commonwealth "is not as a matter of law sufficient to sustain a verdict of guilty of murder in the first degree." These reasons advanced for reargument were premised on two introductory averments in the petition: (1) that the judgments were affirmed by an evenly divided Court; and (2) that the docket "does not reflect the filing of a brief nor the argument of his cases by prior counsel on appellant's behalf." After due consideration, the motion was denied by this Court.

Almost a year later there was presented on appellant's behalf a pleading entitled "Petition for Leave to File Petition for Reconsideration of Petition for Reargument." In this petition it was asserted again that "no brief was ever filed in support of appellant's appeal" and that no oral argument was made, prior counsel having made admissions to this effect. The division of the court with respect to affirming the judgments was again noted, and the contention was advanced, citing *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), which had just been decided, that this division was a denial of appellant's right of appeal as guaranteed by the Constitution of Pennsylvania, and, when coupled with the failure to file a brief or make argument, amounted to a denial of due process of law. This petition was answered by the Commonwealth and after consideration was denied by this Court March 6, 1973.[5]

4. The title of the petition was technically in error, since, as will be discussed *infra,* the case had originally been submitted to the Court on briefs, unaccompanied by oral argument.

5. The basic holding of the majority, as justification for entertaining the instant appeal, is that the lower court was correct in finding that Sullivan's earlier appellate counsel were ineffective, that

Having failed in two attempts in this Court for relief based on the fact that the Court had been evenly divided in its decision and the charge that no briefs or argument had been made in this Court, appellant then filed a petition with the court of common pleas seeking relief under the Post Conviction Hearing Act.[6] The petition again set forth the failure of counsel to file a brief or to make oral argument on appeal and the fact that the decision of this Court was by a vote of three to three, and repeated the charge that defendant's right of appeal had thus been denied him. Numerous other alleged errors of former counsel at trial, together with errors of the trial court, were also set forth as grounds for relief.[7]

After the taking of extensive testimony,[8] the learned hearing judge, noting that this Court had divided evenly,

this ineffectiveness denied Sullivan his right of appeal, and that the proper remedy for this is a new direct appeal. *See* Opinion of the Court, 472 Pa. at ——, 371 A.2d at 476. Thus the result which the Court reaches, i. e., that this appeal properly lies, would be the same even had there been a majority vote in this Court for affirmance at the time of the first appeal. Consequently, the fact of even division in the earlier appeal is not here material and is properly not adverted to in the majority opinion, although it was a factor which weighed with the PCHA court. It may be noted in passing that this Court has recently held that an affirmance of a criminal conviction by an equally divided appellate court does not constitute "final litigation" within the meaning of § 4 of the Post Conviction Hearing Act, Act of January 25, 1966, P.L. (1965) 1580, § 4, 19 P.S. 1180–4, of issues otherwise cognizable under that Act. *Commonwealth v. Rightnour*, 469 Pa. 107, 364 A.2d 927 (1976).

The issues Sullivan raised on his prior direct appeal were not so cognizable, being of non-constitutional dimension.

6. The original petition under the PCHA was filed October 30, 1973. An amended petition was filed on April 4, 1974. To each petition the District Attorney of Philadelphia County filed a responsive answer denying the material allegations.

7. Sullivan asserts that the real relief being sought by the PCHA petition was not a new appeal to this Court but was the grant of a new trial. See brief of appellant at Nos. 121 and 122 at p. 10.

8. Hearings were held on five days between April and August, 1974 before the Hon. Ethan Allen Doty, Administrative Judge. Among those who testified were Sullivan's two trial counsel, the Hon. G. Fred DiBona, now a common pleas judge, and Charles

concluded that "[o]ral argument might have persuaded a different decision." The hearing judge further observed that the "defendant was entitled to a carefully prepared brief by his counsel so that his argument could be fully presented" and found that "it does not appear that that was done." [9] The hearing court then found as a fact that in these respects there was ineffective assistance of counsel, and thereupon entered its order whereby defendant was "granted leave, nunc pro tunc, to refile an appeal to the Supreme Court of Pennsylvania and to file briefs and present oral argument thereon." [10]

Peruto, Esq., the Hon. Alexander Barbieri, the trial judge, two members of the staff of the district attorney, one of Sullivan's alleged co-felons, and Sullivan himself.

9. Judge Doty's findings did not bear out the repeated charge that no brief had been filed on appellant's behalf. Indeed, such an assertion was totally without foundation, and was apparently persisted in because the filing of the brief was not shown in the docket entries of the Prothonotary of this Court. Proper inquiry of members of this Court at an early stage would have laid this question to rest, if indeed verification of the filing of a brief were needed in light of note 1 of the opinion in support of affirmance, 446 Pa. at 419, 286 A.2d 898.

10. It is this portion of the PCHA order from which the Commonwealth has appealed. The order also denied any other relief pursuant to the Post-Conviction Hearing Act for reasons indicated in the seven numbered paragraphs of the hearing judge's opinion. From this portion of the order Sullivan has appealed. Four of the other claims for relief, namely, denial of opportunity to challenge the array of the grand jury, wrongful admission of color slides, admission of hearsay evidence, and want of sufficient evidence, were extensively dealt with in the opinion in support of the order of affirmance on the prior appeal. See 446 Pa. at 431–440, 286 A.2d 898. Judge Doty's opinion states, however, that the photograph issue "can be re-considered" by this Court on reargument, and that on reargument also "there may be a full argument on the question of sufficiency of the evidence." Errors in the trial judge's charge to the jury were not considered by this Court on the prior appeal because not raised here, although they had been asserted in support of the new trial motion. See n. 2, supra. Nevertheless, the post-conviction hearing judge stated in his opinion that the charge to the jury "is also a matter for argument before the Supreme Court." The opinion similarly disposes in blanket fashion of other points not discussed in the opinion.

## 2. Scope of the Post Conviction Hearing Act

The basic error of the court below and of this Court, as I see it, lies in a misconception of the scope and proper function of the Post-Conviction Hearing Act. That Act was designed to allow a defendant to assert after trial and conviction the existence of some egregious fault or flaw in the prior proceedings which denied him the benefits of a fair trial and thus deprived him of due process of law or equal protection of the laws or both. PCHA procedure was intended to take the place in Pennsylvania of petitions for writs of habeas corpus, coram nobis and the like, following conviction. Act of January 25, 1966, P.L. (1965) 1580, §§ 2, 3, 19 P.S. §§ 1180–2, 3.

One of the situations frequently recurring in PCHA proceedings is the inability of the Commonwealth to prove that a defendant-petitioner has been advised of his right to file post-trial motions, *Commonwealth v. Norman,* 456 Pa. 252, 318 A.2d 351 (1974), of his right to appeal the judgments of sentence against him, *Commonwealth v. Mumford,* 430 Pa. 451, 243 A.2d 440 (1968), and of his right, if indigent, to the services of legal counsel on appeal without cost to himself, *Commonwealth v. Sprangle,* 442 Pa. 271, 275 A.2d 114 (1971); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). In such cases the post-conviction court recognizes the right of the defendant to an appeal, and to that end allows the filing and arguing of post-trial motions with the same effect as though this had been done in a timely fashion ("nunc pro tunc").[11]

That, of course, was not the situation here, as Sullivan concedes. Appellant's brief at Nos. 121 and 122, pp. 9–10. Nor did the lower court grant the right to file post-trial motions nunc pro tunc, for such motions had long since been filed and denied. It purported to grant, in-

11. See *Commonwealth v. Faison,* 437 Pa. 432, 436–7, n. 4, 264 A. 2d 94 (1970).

stead, a nunc pro tunc *appeal,* apparently accepting defendant's contention that his purported appeal of 1969 was not an appeal after all because counsel's brief had not been "carefully prepared" and oral argument had been waived.[12] Whether legal services of counsel for a criminal appellant in this Court have been so slip-shod, so careless, so faulty as to add up to ineffectiveness is and must be for this Court, and no other court, to determine.[13] John Sullivan was correct in seeking relief in this Court on the theory of ineffective counsel, first in his reargument petition and then more explicitly in the petition for reconsideration.[14] This Court having denied

12. The hearing court took this action, moreover, with the knowledge that the very points on which he based his decision had been made to this Court in the petition for reargument and rejected. Whether the petition for reconsideration was also part of the record at the PCHA hearing is not clear.

13. For cases in which this Court has held that counsel on appeal has failed to meet the standards of effective appellate representation, see *Commonwealth v. Stone,* 437 Pa. 496, 264 A.2d 406 (1970); *Commonwealth v. Haywood,* 436 Pa. 522, 261 A.2d 78 (1970); *Commonwealth v. Stein,* 436 Pa. 330, 260 A.2d 467 (1969); *Commonwealth v. Trowery,* 435 Pa. 586, 258 A.2d 499 (1969); *Commonwealth v. Stancell,* 435 Pa. 301, 256 A.2d 798 (1969). In each of those cases, we independently determined that the brief or petition for allowance of appeal filed was inadequate and remanded the case to the Superior Court for the filing of a proper brief or petition. Similarly, had we deemed the brief in this case to be so inadequate as to preclude effective review we would not have hesitated to require the filing of a proper brief.

14. I cannot agree with the Court's opinion (*ante,* 472 Pa. p. ——, 371 A.2d p. 474) to the effect that a claim of denial of the constitutional right of a defendant to representation by competent counsel may be entertained only by a trial judge in a post-conviction hearing. While that forum is appropriate for most claims of ineffectiveness, nothing that I have seen indicates that the PCHA in Section 3(6), 19 P.S. § 1180–3(6), was meant to include appellate counsel in a case where counsel had purportedly finished his task. But see *Commonwealth v. Murray,* 452 Pa. 282, 305 A.2d 33 (1973). Nor do I agree that the "institutional capability" (opinion of the Court, *ante,* pp. 474, 475) of this Court inhibits it from passing upon the adequacy of performance to which it and not the lower court or even the client, is witness. If factual determinations are involved relative to matters not of record nor within the direct knowledge of the appellate court, that may be accomplished in a proper case by reference to a master or to a

relief, the court of common pleas should not have undertaken to hear the case at all insofar as the competence of appellate counsel was concerned. Its action in so doing, while undoubtedly taken with the best of intention, was clearly ultra vires under the circumstances.[15]

### 3. The claim of ineffectiveness of appellate counsel

The claim that prior counsel's failure to file a brief and to make oral argument entitles the defendant to a renewed presentation of his case to this Court was considered and rejected by this Court in 1973; it must surely now be considered res judicata.[16] Because, however, the Court considers the matter anew and now reverses itself

trial court to perform a master's function. Far from being a "drastically new procedure," as the Court's opinion states, *ante* at 474, this is the customary manner for such matters to be handled when they arise. See, e. g., *Commonwealth v. Twiggs*, 460 Pa. 105, 331 A.2d 440 (1975); *Commonwealth v. Jackson*, 457 Pa. 237, 324 A.2d 350 (1974); *Commonwealth v. Dupree*, 442 Pa. 219, 275 A.2d 326 (1971). Thus in the case at bar Judge Doty's finding of ineffective assistance of appellate counsel should be viewed as advisory only, if it is to be considered at all.

15. This is not to suggest that the post-conviction court may not in a proper case deal with a claim of ineffectiveness of appellate counsel. For example, where an issue is tendered in a PCHA proceeding which was not raised on a prior appeal, the hearing court may have to determine whether there exist "extraordinary circumstances," such as ineffectiveness of counsel, which would avoid a bar of waiver of any issue not actually raised on direct appeal. *See* PCHA § 4(b), 19 P.S. § 1180–4; *Commonwealth v. Wideman*, 453 Pa. 119, 306 A.2d 894 (1973); *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973).

16. *Commonwealth v. Cheeks*, 429 Pa. 89, 239 A.2d 793 (1968), cited by the majority at 476, is inapposite to the peculiar facts of this case. In this case we were presented not only with a timely petition for reargument but also, as stated above, with another petition for reconsideration, filed approximately a year later. That petition squarely raised the issues of the ineffectiveness of appellate counsel and the denial of Sullivan's right of appeal. The Commonwealth filed an extensive answer and this Court denied relief. The only possible interpretation of our order at that time is that the Court did not accept the appellant's arguments. That is, we were not persuaded that prior counsel had been ineffective and therefore did not believe that Sullivan's appeal rights had been denied.

by affirming the post-conviction hearing court's order, I address the question briefly on the merits.

(A) As previously indicated, a brief was filed on appellant's behalf. This is a fact of which we have personal, direct knowledge. We also know, from having studiously scrutinized the brief at the time of the prior appeal, that it was a good, lawyerlike brief. It consisted of 37 typewritten pages, the first five and one-half being devoted to a detailed recitation of the facts, the balance to legal argument. The headings of the argument portion of the brief are substantially as follows:

(1) Denial of preliminary hearing was error.

(2) Exclusion of jurors who had scruples against capital punishment was error.

(3) Error was committed in admitting into evidence the statements of an alleged co-conspirator.

(4) The evidence was insufficient, as a matter of law, to sustain the convictions.

(5) Error was committed in allowing color slides of the bodies of the victims to be introduced into evidence.

(6) The lower court erred in refusing to quash the indictment.

These are precisely the topics which were dealt with, with some rearrangement, in the opinion in support of affirmance. See *Commonwealth v. Sullivan*, 446 Pa. 419 286 A.2d 898 (1969). Indeed, these are the same arguments that are dealt with in the new brief now before us on Sullivan's behalf in his direct appeal at No. 121 except that the first two points of the original brief have been dropped.[17] The primary substantive difference be-

17. The remainder of Sullivan's present brief (which is concerned with the appeal at No. 122 from denial of post-conviction relief) is devoted to five claims of ineffectiveness of trial counsel, claims which were denied by Judge Doty in the post-conviction proceeding. These points, of course, could not have been presented by original appellate counsel, who were also trial counsel. They

tween appellant's original brief and the current one is that the latter includes citations to cases decided since 1970.

The court characterizes the brief of prior counsel as "highly unorthodox" because it failed to comply with our rules. (Opinion of the Court, *ante* 472 Pa. at 145, 371 A.2d at 476). It is true that the brief had no proper backer, one segment was triple-spaced and it lacked a statement of jurisdiction and of questions involved or a summary of argument.[18] It is one thing to say that this was careless disregard of our rules relative to the formalities of constructing a brief; it is quite another thing to conclude, as does the majority, that this type of unorthodoxy equates with constitutional inadequacy. We are, unfortunately, treated to non-conforming briefs at session after session, but this does not mean that the content may not be sound, solid and effective advocacy. In my personal judgment, the brief here in issue was just that. The majority, however, like the court below, fails to examine the content of the brief and thus ignores substance while exalting form when it now holds the brief to be legally ineffective.[19]

were thus proper subjects of a PCHA petition, *Commonwealth v. Dancer*, 460 Pa. 95, 331 A.2d 435 (1975), and are now properly before us in the appeal at No. 122. I agree with the Court in its affirmance of denial of post-conviction relief.

18. The brief was prepared by Judge DiBona as a rough draft before he went on the bench and sent by him to his former co-counsel, Mr. Peruto, thereafter. The record is unclear as to who filed it with the Supreme Court, although Mr. Peruto assumed "someone in my office might have done something about it." N. T. 285a. The Deputy District Attorney, James D. Crawford, Esq., testified that he received his copy of the brief from Mr. Peruto's office; also that he was "with Mr. Peruto personally in the Supreme Court Prothonotary's office when they [the briefs of the parties] were filed, or when they had been filed. I don't know whether they were filed at that date or filed a day or two before." The attorneys were in the prothonotary's office to arrange for the submission of the case on briefs. The date was on or about November 26, 1969. [N.T. 454a].

19. The opinion of the Court states in wholly conclusory fashion (n. 10, 472 Pa. p. 146, 371 A.2d p. 476 of its opinion, *supra*) that

(B) The other basis on which the PCHA hearing judge and this Court find ineffectiveness by prior counsel is the waiver of oral argument. I agree that it would have been preferable for counsel to make such an argument. While opinions of judges differ as to the value of such arguments, my own view is that, more often than not, they are helpful to the appellate court.[20] But to say as much is not to suggest that absence of oral argument is apt to make a difference in the outcome of a case—especially a case that, due to a heavy backlog of cases awaiting disposition, cannot be decided for some time to come.[21] That there was nothing unusual in Sullivan's counsel having waived argument is shown by the fact that in the calendar year 1975, nineteen appeals from convictions of murder in the first degree were submitted to this Court on briefs; in the calendar year 1976, at least twenty-six such appeals were submitted on briefs. Moreover, in no appeals from orders rendered in PCHA proceedings do we permit oral argument except by special order of court, notwithstanding that all such cases appealed as of right to this Court involve felonious homicides. Pa.R.A.P. 2311(b), formerly Supreme Court Rule 71.

the brief "did not represent the studied exposition of the difficult and complex issues raised in this trial". I flatly disagree. The only testimony in the post-conviction record as to the quality of the brief filed on appellant's behalf by his prior counsel, came from James D. Crawford, Esq., the Deputy District Attorney, who was accepted as an expert in appellate practice [452a]. Mr. Crawford characterized the brief as "excellent" [456a, 457a].

20. Restrictions on oral argument are being frequently imposed by appellate courts because of their heavy workloads, a condition suffered by each of the three appellate courts of this Commonwealth. See, e. g., the new Rule 12(6) of the United States Court of Appeals for the Third Circuit, as amended November 18, 1974.

21. This Court has always permitted oral arguments to be waived in the first instance, see Pa.R.A.P. 2311(a) formerly Supreme Court Rule 32, but will order argument in a submitted case where it feels that it would be particularly helpful; it may even order reargument in a case already once argued in order to obtain further clarification.

As to the reason oral argument was waived, Mr. Sullivan testified that Mr. Peruto, his counsel, thought the case should not be argued for political reasons and to avoid a presentation to this Court, in the presence of the families of the victims, of the unpleasant details of the assassination-type killings here involved. In a case where the evidence was circumstantial and a paramount issue was sufficiency, it is understandable that counsel could conclude, in his client's best interest, that the less said about the factual details, the better.[22] In any event, waiver of oral argument cannot be said as a matter of law to have rendered counsel constitutionally ineffective.[23]

To recapitulate, at No. 127, I would reverse the order of the court of common pleas granting Sullivan leave, nunc pro tunc, to refile a direct appeal to this Court as of November Term, 1966. Since, however, the majority of the Court affirms that order and considers the case anew on its merits at No. 121, I deem it appropriate to indicate my agreement with its conclusion that the judgment of sentence should be affirmed. The appeal of Sullivan from the post-conviction proceeding order at No. 122 is properly before the Court, and I concur in the affirmance of that order.

22. The Third Circuit's Internal Operating Procedure B.3, entitled Suggested Criteria for application of Rule 12(6), states in part:
"A. Experience discloses that judges usually vote to eliminate oral argument: . . .
(3) Where the sole issue is sufficiency of the evidence, the adequacy of jury instruction or rulings as to admissibility of evidence and the briefs make adequate reference to the record and the state of the record will determine the outcome." 19 U.S.Sup.Ct.Digest, L.Ed. (1975 Cum.Supp.—Court Rules at 24).

23. I note with interest the following statement by present counsel for Mr. Sullivan at the conclusion of the post-conviction proceedings before Judge Doty:
"Ms. Gelb (addressing the court): We consulted with Mr. Sullivan and he has agreed that there is no need for oral argument. We will submit on briefs." [N.T. 612a].

O'BRIEN, J., joins in this concurring and dissenting opinion.

MANDERINO, Justice, concurring and dissenting.

I join in the concurring and dissenting opinion of Mr. Justice Roberts, and would reverse the judgment of sentence and order appellant discharged because I believe the evidence was insufficient to prove beyond a reasonable doubt that appellant was one of the perpetrators of the homicides. In addition, I wish to express my amazement and dismay at the majority's approval of the use at trial of the color slide photographs depicting the bodies of the victims in the instant case. I have viewed these photographs. If these photographs do not warrant a reversal and remand for new trial, no retrial will ever be granted because of the admission of inflammatory photographs. Every prior case of this Court granting a new trial because of the admission of inflammatory photographs is *sub silentio* overruled by the majority's holding that the photographs admitted in this case do not warrant reversal. These photographs are more gruesome than any other color slides or photographs which I have seen in any previous appeal before this Court. They can accurately be described as a "horror show." Such a show must have affected the jury greatly. Very few persons exposed to full color slide photographs of blood smeared bodies, with bullet riddled faces, lying in literal pools of blood, could dispassionately decide whether the prosecution had sustained its burden of proving beyond a reasonable doubt that the perpetrator of such crimes was, in fact, the same man accused of committing them. Because of the serious disagreement among the members of this Court as to the sufficiency of the evidence in this case, we should be particularly careful to avoid condoning something which may have unfairly tipped the scales of justice against the appellant at trial.

Over defense objection the prosecution offered into evidence thirty-nine color slides taken by the medical exam-

iner at the scene of the crime. These slides were shown to the jury for a total time of eighteen minutes and twenty-seven seconds. On the average, therefore, each slide was projected for almost thirty seconds. The group of thirty-nine slides can be divided roughly into four categories. The first category, consists of eight slides depicting the outside of the building in which the victims' bodies were found, a window with a bullet hole, the layout of the parking lot outside the building, the victim Janda's purse, a brown paper lunch bag sitting on the window sill, and some severed telephone lines. The second group of photographs contains various shots indicating the relative position in which the victims' bodies were found. This group includes overall views of the room, scenes showing the relative locations of the desk, various chairs and other office equipment, and the bodies. The third group consists of eight close-up photographs of the head and body of the victim, Gorey. The last group consists of fifteen close-up photographs showing the victim, Janda's head and body in various positions. It is these latter two groups which are particularly objectionable here.

Of the eight photographs of Gorey, five are photographs of the body depicting it from the waist area to the top of the head, in the position it was found lying on the floor. These five photographs show the victim lying on his back on the floor with his head up against the wall, with eyes closed, chin on shoulder, left hand on chest. Plainly visible is a bullet hole in the middle of the forehead just above the eyebrows; a bullet wound in the corner of the left eye; blood coursing from the bullet wound of the forehead; blood coursing from the bullet wound of the eye; blood, dried and caked in layers coursing from the nose; blood flowing from the right ear; the entire collar and part of the shoulder of the shirt stained and splattered with blood; blood flowing from a bullet wound in the abdominal area just to the left of the navel;

and a bullet wound just to the left and above the navel. In another of the photographs in this group, the body has been rolled over to expose the back, stained purple from the settling of blood, with blood-soaked shirt lifted to reveal a bullet wound to the back. The remaining two photographs of the victim, Gorey, depict almost identical close-up shots of the victim's face; both reveal in horrid detail the bullet wound to the center of the forehead and the bullet wound to the left eye. In both shots fully one-half of the victim's face and neck is completely covered with blood. In fact, these photographs reveal the blood flowing from the victim's nose to be dried thick upon his cheek.

The fifteen photographs depicting the victim, Janda, can also be divided into three groups: one depicting an overview of the body of the victim as it lay on the floor; one group depicting the body from the area of the waist to the top of the head in various positions on the floor; and one group depicting close-ups of various portions of the victim's anatomy. There is only one photograph in the first group. It depicts the victim lying on her left side on the floor (the desk under which she was found having apparently been removed for purposes of the photograph) in a pool of blood extending from near the top of her head down to her waist. The group of photographs depicting the victim's torso consists of seven photographs. Three of these are almost identical. They show the victim lying on her left side with her face on the floor, surrounded by dried, caked, blood. These photographs also reveal three bullet wounds to the right side of the head: one in the hair above and to the rear of the right ear; one just in front of the right ear at about the point where the jaw bone connects to the skull; and one to the right temple, just to the rear and above the right eye. Thick, dark red, dried blood extends from all three wounds across the face.

Another photograph reveals the victim's upper back and right shoulder with her blouse pulled up to reveal a bullet hole in the upper right arm and a back almost completely covered with blood; this picture also reveals a mass of blood on the rear of the victim's head just above her right ear. The last three photographs in this group show the victim in various positions lying on her back in a pool of blood, with the head, chest, and arms completely covered with blood; her left eye is swollen and blackened, blood courses from her nose and mouth, the left side of her head is red with blood, as if painted with a brush, her arms are completely covered with blood, and blood flows in a river over the floor around the body. Two of these photographs are almost identical views of the victim's face and chest area showing her to be *completely* covered with blood from near the top of her head to her waist. In fact, her blouse is saturated with blood over the entire area of her chest. In one of these photographs the victim's shirt has been opened to reveal her brassiere, saturated with blood, and a bullet wound to the lower abdomen several inches below and to the right of her navel. In this photograph, the victim's upper lip is drawn slightly upward, revealing her teeth in a grotesque "snarl."

The last group of photographs of the victim, Janda, consists of seven close-up photographs of various parts of her anatomy. The first depicts the front of her blood-stained blouse. The second depicts a portion of her nude torso from just above the right breast to approximately four inches below the navel, revealing at least two bullet holes in the area just above and just below the navel. The third is a close-up of the victim's face, neck and upper chest revealing a bullet hole to the right temple, a bullet hole in the left corner of the right eye, blood flowing from the right ear, and blood staining the hair bright red. The next photograph is a close-up of the victim's right shoulder taken from the rear, re-

vealing a bullet hole to the upper right arm and also shows the victim's chin, mouth, right breast, and right arm stained with blood. The next is a close-up view of the right side of the victim's face, with the face and neck occupying almost the entire frame. It reveals the bullet wound to the right temple, with the blood that once flowed from it across the forehead now dried and caked. It also reveals the bullet wound to the left corner of the right eye, a mass of dried, caked blood in the hair just in front of the right ear, and blood staining the entire area of her cheek, forehead, and neck. The next is an identical close-up of appellant's face taken from the right, this time with some of the blood removed to more clearly reveal the bullet hole in the left corner of the right eye, the bullet hole in the right temple, the dried and caked blood in front of the right ear, and blood staining the victim's blonde hair red at the top of her forehead. The last of this group of photographs shows the left side of the victim's face, the left side of her neck and her right breast, indicating the blackened, swollen, left eye, blood flowing from the nose, and blood flowing from the left ear. In this photograph a section of hair has been shaved to expose a bullet hole in the skull above and to the rear of the left ear. It also shows the victim's ash blonde hair stained bright red by the blood.

In *Commonwealth v. Scaramuzzino*, 455 Pa. 378, 317 A.2d 225 (1974), we noted that the practice of admitting photographs of the body of the decedent is to be condemned unless those photographs have *essential evidentiary value*. Although the admission of such photographic evidence has been held to be a matter within the discretion of the trial judge, the test remains one of ascertaining whether or not the photographs are of such *essential evidentiary value* that their need *clearly outweighs* the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Powell*, 428 Pa. 275, 241 A.2d 119 (1968). Furthermore, ". . . the

more inflammatory the photograph the greater the need to establish the *essential evidentiary value.*" (Emphasis added.) *Commonwealth v. Scaramuzzino*, 455 Pa. at 381, 317 A.2d at 226.

In *Scaramuzzino*, we reversed and remanded for a new trial because *fourteen* color slides were introduced over defense counsel's objection. The ostensible purpose for their introduction was to support and clarify the pathologist's testimony as to the cause of death.

"The slides in issue involved three photographs of the heart removed from the body of the deceased, five portrayed the wounded portions of the nude torso emphasizing, because of the color, the dried blood, including a side view of the torso with glass rods protruding from the wounds to indicate the direction of the wounds; three photographs which were virtually identical to three previously shown but with the blood removed; one photograph of a wound at back of the ear with the hair pulled away; one slide of a wrist wound; and one of a finger wound. The total viewing time was ten minutes and five seconds."

*Id.* at 380–81, 317 A.2d at 226.

Commenting upon this slide show we said in *Scaramuzzino,*

"[n]ever before have we been faced with the admission of so many slides, unquestionably repetitive, and viewed for so long a period of time. (Footnote omitted.)"

*Id.* at 381, 317 A.2d at 226.

In refusing to accept the prosecution's contention that the photographs in *Scaramuzzino* were necessary "to aid the pathologist in explaining to the jury the wounds which were suffered by the decedent . . . and injuries which resulted in her death", we distinguished *Com-*

*monwealth v. Collins*, 440 Pa. 368, 269 A.2d 882 (1970), stating that *Collins*,

> ". . . involved .only a single slide which was 'as noninflammatory as possible because all excess blood had been removed from the decedent's face before the photograph was taken, so this is not a case where some less inflammatory version of the slide could have been utilized.'"

455 Pa. 382, 317 A.2d 227.

The prosecution in *Scaramuzzino*, on the other hand, had made no effort to limit the slides to those reasonably necessary to aid the pathologist's testimony, or to those in which excess blood had been removed. We therefore concluded that

> "there was certainly no need for *three* pictures of the heart removed from the body; nor was there any evidentiary purpose whatsoever in introducing slides of the nude torso, arm, and back with excess blood plainly visible where these same slides, but without blood, were available and were indeed introduced." (Emphasis in original.)

*Id.* at 383, 317 A.2d at 227.

The majority opinion here attempts to supply the "essential evidentiary value" required by *Powell, supra,* and *Scaramuzzino, supra,* by stating that the slides were "offered to aid the jury in understanding the physical scene of the crime, the nature and extent of the wounds inflicted and the brutality of the murder to graphically demonstrate the existence of an intent to take life." (Maj. opinion at pages 481, 482). In concluding that the photographs at issue here were admissible for these purposes the majority overlooks our conclusion in *Scaramuzzino* that such slides ". . . should not be resorted to where the witness can clearly convey the facts to the jury without their use." 455 Pa. at 383, 317 A.2d at 227.

In *Scaramuzzino* we condemned introduction of the photographs because they showed various parts of the

victim's body with its heart having been removed by the pathologist. We felt that such photographs were highly inflammatory. In the instant case we have almost three times as many photographs shown to the jury for almost twice as long a period of time, depicting the bodies of the victims, revealing in horrible detail how they were mutilated by the perpetrator of the homicide. The inflammatory effect of the photographs in the instant case was significantly greater, it seems to me, than was condemned in *Scaramuzzino*.

In *Scaramuzzino* we concluded that the photographs had no evidentiary value because the facts which they were introduced to convey to the jury—the nature and direction of the wounds,—could as readily have been conveyed to the jury by less prejudicial means. The same is true in the instant case. Those photographs depicting the physical scene of the crime, while some of them were gruesome to the extent that they depicted the blood flowing across the floor, and were objectionable for that reason, could have been taken after the blood had been cleaned. Those photographs which were introduced to show the jury the nature and extent of the wounds were completely unnecessary because the pathologist's testimony provided the jury with that information. Furthermore, if the prosecution felt it desirable, schematic drawings of the victim's bodies, showing the relative position of the various bullet wounds could also have been provided for the jury's benefit. The same is true of their ostensible evidentiary value to show that the perpetrator possessed the intent to kill necessary to convict of murder in the first degree. Testimony by the pathologist as to the number and nature of the wounds was more than adequate to prove this element of the crime. As in *Scaramuzzino,*

> "These slides were simply cumulative to the pathologist's testimony as to the cause, position, number, and severity of the wounds."

455 Pa. at 383, 317 A.2d at 227.

In short, the photographs provided no information that could not have been amply supplied by other sources. The one thing that their introduction accomplished, however, was to assure that no jury would return a verdict of not guilty. For these reasons it was an abuse of discretion to allow them to be shown to the jury.

I would therefore reverse the judgment of sentence.

ROBERTS, J., joins in this concurring and dissenting opinion.